# FERGUSON *v.* BATEMAN.

EQUITY PLEADING AND PRACTICE; EQUITY; TRUSTS.

The defendant organized a syndicate for the purchase of a tract of land, which was to be sub-divided into building lots and resold. He represented the cost of the land to be $65,000, and subscriptions to the syndicate were made on that basis. Shares in the venture were retained by the defendant, and the complainants became subscribers and paid for their shares. The title was vested in the defendant as "trustee," and the entire management of the property and the disposition thereof was entrusted to him. Subsequently, a bill in equity was filed by certain members of the syndicate as complainants, to compel an account of the management and sale of the property and the disposition of the proceeds. The defendant's answer disclosed the fact, theretofore unknown to the complainants, that before the title of the land was vested in him as trustee for the syndicate, the defendant and two associates had contracted with the then owner of the land for its purchase for $50,500, thereby realizing a profit of $14,500, in the transaction. *Held :*

1. That although the bill contained no special allegation or prayer for relief on that account, the defendant, as a trustee, could be made to account to the other members of the syndicate for their proportion of this profit ; the bill being for an accounting generally, the entire administration of the trust was reviewable, under the prayer for general relief contained in the bill.

2. That because of the fiduciary relations between the defendant and the complainants, the allegations in the defendant's answer with respect to the purchase and resale of the property to the syndicate, although the answer was sworn to by him, did *not* shift the burden which equity imposed upon him as a trustee, to show that throughout the entire transaction no deception was practiced by him upon them, and that all was fair, voluntary and well understood between the parties ; and

3. That, without respect to the burden of proof, the testimony in the case showed that the defendant deceived the complainants with respect to the purchase of the land, leading them to believe that the purchase was made from the owner of the land for the sum of $65,000, and concealing from them his previous contract to purchase the land for $50,500, and the consequent profit of $14,500 in the transaction which he appropriated to himself, and that, therefore, he was accountable to the complainants for their proportional share of such profit.

No. 89.   Submitted September 28, 1893.—Decided November 6, 1893.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, holding an equity term, in a suit for an accounting by a trustee. *Reversed.*

The Court in its opinion stated the case as follows:

In the latter part of 1883, Arthur E. Bateman formed a syndicate for the purchase of certain lots on Columbia Heights, adjoining the city of Washington. The agreement signed by the parties reads as follows:

"Washington, D. C., Nov. 27, 1883.

"We, the undersigned, hereby agree to subscribe the sums set opposite our names towards paying the sum of twenty-five thousand dollars ($25,000) cash on real estate on Thirteenth street, Columbia Heights, in Washington city, described as follows: Lots Nos. eight (8), nine (9), ten (10), and eleven (11), in block No. twenty-one (21); Lots Nos. five (5), six (6), seven (7), eight (8), in block twenty-two (22); lots Nos. one (1), two (2), in block No. twenty-three (23); lots Nos. two (2), three (3), four (4), five (5), six (6), sixteen (16), seventeen (17), eighteen (18), nineteen (19), twenty-two (22), twenty (20), twenty-one (21), in block No. thirty-six (36); lots Nos. two (2), three (3), four (4), five (5), six (6), seven (7), eight (8), ten (10), twelve (12), thirteen (13), fourteen (14), fifteen (15), nineteen (19), twenty (20), twenty-one (21), twenty-two (22), in block No. thirty-seven (37). The total amount to be paid is sixty-five thousand dollars ($65,000), and the proportion of profit and liability is to be the proportion that the sum subscribed is to the amount of ($25,000) twenty-five thousand dollars.

| | |
|---|---|
| Wm. B. Leonard for B.................... | $6,000 |
| Mary C. Carr............................ | 4,000 |
| A. E. Bateman........................... | 2,000 |
| Adolph Meyer............................ | 2,000 |
| Virginia A. Grafton..................... | 2,000 |
| L. G. Shepard........................... | 2,000 |
| W. W. Dudley (B)........................ | 3,000 |
| Helen M. Betts.......................... | 2,000 |
| Curtis & Burdette....................... | 2,000 |
| | $25,000 |

The signatures to this agreement were attached at different times down to December 29, 1883, and the payment by the last subscribers, Curtis & Burdette, was not made until January 2, 1884.

A certificate was issued to each subscriber, differing only in the recital of the interests respectively held. That issued to Curtis & Burdette reads as follows:

District of Columbia,
City and County of Washington, } *ss* :

Whereas, the undersigned has, as trustee, purchased for the sum of sixty-five thousand dollars ($65,000), twenty-five thousand dollars ($25,000) being paid in cash, the following described real estate on Thirteenth street, Columbia Heights, in Washington, D. C., * * * for the purpose of making sales of the same. Now these presents witness that Curtis & Burdette, of Washington, D. C., have a share in the profits and liabilities to be realized from the purchase and sale of said property in the proportion of two twenty-fifths ($\frac{2}{25}$) thereof.

Witness my hand and seal this fourth day of January, A. D., 1884.

A. E. BATEMAN, Trustee. [Seal.]

The subscription made by W. W. Dudley was in trust for Clement W. Ferguson and Frank Reeves, of Indiana, to whom, before the filing of the bill herein, he made an assignment which was recognized by all parties at interest. Curtis & Burdette were partners, and Curtis died before litigation commenced.

Before all the lots were sold out, viz., June 3, 1890, this bill was filed by Ferguson and Reeves and Samuel S. Burdette, surviving partner of Curtis & Burdette, to which all parties at interest were made defendants, praying for the appointment of a receiver, for an accounting by Bateman, trustee, and a final distribution.

The bill alleges the formation of the syndicate by Bateman, who was himself a member, as follows:

" 3. In or about the month of December, 1883, the defendant, Arthur E. Bateman, induced a number of other persons to pay to him considerable sums of money, to be used by him with other money to be advanced by himself, in the purchase of real estate in the District of Columbia and adjoining the city of Washington, in his name, in trust for the use and benefit of himself and such other persons, as a speculation, it being the expectation and intention that the property would be sold at a profit, and the gains divided among the persons advancing the money, including said Bateman, in the proportion in which their several advances were made. Among the persons who were so approached by said Bateman was the defendant William W. Dudley. Said Dudley was an acquaintance and friend of the complainants, Clement W. Ferguson and Frank Reeves, and said Dudley informed them of said project and suggested that the enterprise would be likely to be a profitable one, and thereupon it was agreed between the complainants, Clement W. Ferguson and Frank Reeves, on the one hand, and said Dudley on the other, that the said complainants should contribute the sum of three thousand dollars for the purpose aforesaid, and that they should pay the same to said Dudley, who was to pay the same over to said Bateman. Accordingly the said Ferguson and Reeves, on or about the —— day of ——, 1883, each paid said Dudley the sum of fifteen hundred dollars, and on the 29th day of December, 1883, said Dudley paid to said Bateman said sum and at the same time received from said Bateman a receipt.

\*     \*     \*     \*     \*     \*     \*     \*     \*

" It was represented to said Dudley and the complainant, Samuel S. Burdette, by said Bateman, that the sum of $25,-000, and that amount only, had to be raised for the purpose of making the purchase which he had in view, and when that amount (including the contribution which said Bateman was himself to make to the joint fund) had been obtained,

said Bateman executed and delivered to each of the contributors a formal declaration of trust."

It was further alleged that with the money so contributed the purchase of the lots was made. There is no charge in the bill that Bateman misrepresented the price paid by him in the purchase, and thereby defrauded his associates whom he represented, as the promoter and active manager of the enterprise.

The bill contains other allegations, complaining that lots had been sold improperly to members of the syndicate, among others to the wife of Bateman, but as all of these matters have been settled by consent decree in the court below, it is unnecessary to repeat them here. Receivers were appointed, who have sold out the lots undisposed of by Bateman, and the controversy is over the disposition of the fund remaining on hand as between complainants, in the proportion of their shares, and defendant Bateman.

In his sworn answer to the bill, defendant Bateman undertakes to give the history of the transaction as follows:

" 3. It is not true, as alleged in the third paragraph of the bill, that this defendant induced other persons to pay to him considerable sums of money, to be used with other money to be advanced by himself, in the purchase of real estate in the District of Columbia, adjoining the city of Washington; but it is true that on or about ———— day of August, 1883, this defendant purchased, by verbal contract, from the Hon. John Sherman the property in the bill mentioned, for the sum of fifty thousand five hundred dollars ($50,500), as trustee for himself and two other persons, and on the 15th day of October, 1883, the said John Sherman, trustee, entered into a written contract with this defendant, as trustee for himself and the other two persons, by which he agreed to sell to the said defendant, as such trustee, the lands in the bill mentioned. After this contract of sale was made with the Hon. John Sherman, the defendant transferred to Henry D. Green, for value received, all interest, benefit, etc., in this contract, to be held by the said Green as trustee for the three pur-

chasers from the Hon. John Sherman. After this assignment to Green, and early in the following year, this defendant agreed to sell the said property to a new syndicate for the price of sixty-five thousand dollars ($65,000). In making the sale to this new syndicate, the property was divided into twenty-five (25) shares. Mary C. Carr took four twenty-fifths; W. W. Dudley, three twenty-fifths; Helen M. Betts, two twenty-fifths; Curtis & Burdette, two twenty-fifths; Leonard G. Shepard, two twenty-fifths; Virginia A. Grafton, two twenty-fifths; Norman H. Farquhar, one-twenty-fifth; John E. Beall, seven twenty-fifths; Adolph Meyer, trustee for B. F. Jonas, of Louisiana, two twenty-fifths. Upon the formation of this syndicate as above, the said Henry D. Green, by articles of agreement, transferred the said property to this defendant for the benefit of the new syndicate, and in the proportions of their interests as above set forth.

"4. The defendant denies that he purchased the property from the Hon. John Sherman with the money contributed as aforesaid by the new syndicate. On the contrary, he avers to be true that before the last syndicate was formed, he had, as above stated, with two others, purchased this property from the Hon. John Sherman, for the sum of fifty thousand five hundred dollars ($50,500.00), and sold it to the new syndicate for the sum of sixty-five thousand dollars ($65,000.00). He admits to be true that the persons composing the last mentioned syndicate did convey the said property to this defendant, as trustee, on the twenty-third day of September, 1886, by a deed of that date in trust to sell said real estate or any part thereof at any time, either at public or private sale, and upon such terms as the said Bateman might deem for the best interest of those concerned, and to convey the said real estate to such purchasers free from liability, and to receive such purchase money and pay the same over to the grantors according to their respective shares of the proceeds of sale."

The answer of Belle Bateman, wife of A. E. Bateman, sets out in greater detail the history of the purchase from Sher-

man. She says it was made October 13, 1883, and that Bateman, acting for himself and as trustee for William B. Leonard and Mary C. Carr, contracted with Sherman for the property, paying $10,000 in cash and promising to pay $40,500 in five years, with five per cent. interest. And that said Bateman, with the consent of the said Leonard and Carr, on November 6, 1883, conveyed the property to Henry D. Green, to hold the same in trust for Bateman, Leonard and Carr, and prior to that time had no negotiations whatever with any of the complainants. She further alleged that the property rose greatly in value, about the early part of December, 1883, when the three owners aforesaid conceived the idea of selling the same to a syndicate thereafter to be formed, for the sum of $25,000 in cash and $40,000 in time payments corresponding with the times that the $40,000 due to Sherman by Bateman would mature, " and with reference to the convenience of meeting the Sherman payments out of the anticipated payments under the syndicate so proposed to be formed, and which payments were to be assumed by the purchasers under the said syndicate."

Mary C. Carr also answered the bill under oath, in which she stated that she was induced by Bateman to enter into the purchase of the lots from John Sherman for $65,000; that it was contemplated that the said Bateman, as trustee for those advancing the said sum of $25,000, should contract to buy of the said John Sherman the said property to be sold for the benefit of the parties advancing the $25,000, including sales necessary to pay the $40,000 still due Sherman, and that she paid Bateman $4,000 and received a certificate of her interest in the syndicate.

Receivers were appointed, who sold out the remaining lots. Several consent decrees were passed during the pendency of the suit, through which the claims of all parties to the fund have been satisfied, saving those of complainants as against Bateman, and the sum of $2,500 in promissory notes in the hands of the receivers, was ordered retained by them to await the result of complainant's action. As between

complainants and Bateman, a decree was finally passed refer-
ring the cause to the auditor to state the accounts between
them, taking as a basis the trust agreement for the $65,000
as the purchase price to the syndicate, and providing that
" said Bateman shall not be charged with any sum on ac-
count of the difference between the sum at which he pur-
chased said land from John Sherman and the said sum of
$65,000." It is from this decree that the complainants ap-
pealed to the General Term from which the case has been
transferred to this court under the provisions of the law of
its creation.

*Mr. A. S. Worthington* for the appellants:

The case of the complainants is based upon fundamental
principles of law and justice. Bateman invited them to unite
with him in the purchase of a tract of land for $65,000. They
understood that he and they were going into the deal on
even terms. They asked his opinion as to the value of the
land, and relied upon his judgment in that regard. He does
not deny this as to Dudley, and admits it as to Curtis and
Burdette. He was their partner—their special and trusted
agent. He knew then, what all know now, that if he had
disclosed to them the fact that he had in his pocket a contract
for the purchase of the same land for $50,500—that by this
contract the cash payment was to be only $10,000, while he
was calling upon them to contribute upon the basis of a cash
payment of $25,000, and a total payment of $65,000—they
would not have gone to him for advice or entered into the
syndicate. His very silence was fraud. But when we see
from the testimony of Burdett, and from the conclusive evi-
dence of the deed from the members of the syndicate to
Bateman, that he affirmatively informed the complainants
that he was buying the property from Sherman for them we
have a clear case of fraudulent misrepresentation which was
made to deceive and which accomplished its work. And
whether it was concealment merely, or actual misrepresenta-
tion, that misled the complainants, they are entitled to relief

in a court of equity, and the cause should be remanded with instructions to direct the receivers to pay to the complainants the $2,500 which by the stipulation of the parties is held to await the determination of this appeal.

*Mr. H. H. Wells* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

It is the contention of appellants that Bateman occupied such a fiduciary relation to them and other members of the syndicate as that he could not, in equity and good conscience, retain from them the difference between the $50,500 actually paid to Sherman and the $65,000 charged them; and that in the final settlement of his account as trustee he should be made to account to them for their proportion of the same.

On the other hand, Bateman contends that he made the purchase from Sherman for himself and as trustee for Leonard and Miss Carr, without reference to the parties afterwards taken into the syndicate formed by him; that this syndicate purchased the land from him and his associates in the original purchase at the agreed price of $65,000, and that complainants have no right to complain, or hold him to account for any part of the profit made by him in the transaction.

1. The appellee contends that this claim is not embraced within the allegations of the bill, and hence, no matter what the proof may show, the complainants are not entitled to have it considered or to have any accounting therefor. It is true that this matter is not made a ground of complaint in the bill, and it appears from the evidence that the complainants had no knowledge at the time of filing the bill that Bateman had purchased the land from Sherman at $50,500, and had made a profit of $14,500 in turning it over, or reselling it, to himself as trustee for the syndicate to which they belonged; and that their first knowledge thereof was derived from the answers of Bateman and his wife to the bill.

We do not think this objection well taken. The bill, being for an accounting, necessarily brings the entire adminis-

tration of the trustee into review as it may be developed by the evidence, under the prayer for general relief.

2. It appears clearly from the evidence that Bateman organized the syndicate for the speculation in the land, and that the complainants joined it, reposing complete confidence in him. They made no inquiry into the details of the purchase or the title to the land. They were not shown, and had no knowledge of, the contract of October 15, 1883, between Bateman and Sherman for the purchase of the land at $50,500, which was in possession of Bateman and unrecorded. They entrusted the entire management and sale of the property to him. Some time after this, one of the trust certificates issued by Bateman was filed for record, the consequence of which was to raise a doubt among probable purchasers as to his right to convey a good title. To remedy this, it seems, a deed was made and signed by all the interested parties, September 23, 1886, and duly recorded October 13, of the same year.

The purposes of this deed and the implicit confidence still reposed in Bateman appear from its recitals as follows:

" Whereas said Arthur E. Bateman has heretofore, for himself and as trustee for the parties hereto of the first part, contracted to purchase from John Sherman, acting as trustee under a deed from Elizabeth J. Stone, recorded among the land records of the District of Columbia, in liber 957, folio 465, the real estate hereinafter described with the view of making sales thereof for the benefit of those interested who have contributed to the payments made on account of the purchase money. And whereas, said parties of the first part desire to confer upon said Bateman full discretionary power of sale and conveyance of said real estate. Now, therefore, this indenture witnesseth, that the said parties of the first part for and in consideration of the sum of five dollars, current money of the United States, to them in hand paid by the said party of the second part, the receipt of which before the ensealing and delivery of these presents is hereby acknowledged, have granted, bargained and sold, aliened and en-

feoffed, conveyed and confirmed, and by these presents do grant, bargain and sell, alien, enfeoff, convey and confirm unto and to the use of the said party of the second part, his heirs and assigns, all those certain pieces or parcels of land and premises situate and being in the county of Washington, District of Columbia, and known and distinguished as * * *

"To have and to hold the said land and premises, with the appurtenances and hereditaments. to the same belonging, unto and to the only use and benefit of said party of the second part, his heirs and assigns. In and upon trust nevertheless, for said parties of the first part, their heirs and assigns, as tenants in common and not as joint tenants. And in trust to sell said real estate, or any part thereof, at any time, either at public or private sale, and upon such terms as said Bateman may deem most for the interest of those concerned, and upon compliance by the purchaser or purchasers with the terms of sale, to convey the real estate so sold to the purchaser or purchasers thereof, his, her, or their heirs and assigns, in fee simple, free, clear and discharged of and from all liability to see to the due application of the purchase money. And upon trust, forthwith to pay over to the parties of the first part, their heirs and assigns, as tenants in common and not as joint tenants, their respective shares of said proceeds of sale."

The first paragraph of this recital was offered by complainants to prove that Bateman represented himself as making the purchase from Sherman for the benefit of the syndicate, and—though he denied ever having seen it—as an estoppel to his defense that the land was originally purchased from Sherman, not for their benefit, but for his own, in connection with Leonard and Carr. This question will be considered later, and the other recitals, about which there is no question, are here referred to as showing the trust and confidence reposed by complainants and other signers, in the capacity, integrity and good faith of Bateman.

3. It is contended on behalf of Bateman, that his sworn answer setting out the facts with respect to the purchase

from Sherman and subsequent independent sale to the syndicate, must stand as true until overthrown by the testimony of at least one credible witness supported by strong corroborating circumstances; and he denies the sufficiency of the proof to show the existence of any trust relation, as that term is understood in equity, between him and the members of the syndicate, or that he was under any obligation to disclose to them his previous purchase of the land and the profit that he was making out of their purchase. We cannot give our assent to this proposition. The bill made no charge of misconduct respecting the purchase of the land. It was on this very ground, as we have seen, that appellee denied the right of complainants to hold him to account for the profits made therein.

In fact, complainants did not know the history of this purchase until informed thereof by the answers of Bateman and wife. No discovery was prayed concerning it, and no special relief. The prayer was for an account of the administration of the affairs of the syndicate, and it is probable that had the answers not disclosed the double purchase and sale, the accounting might have been had without a question being raised concerning it.

Having shown by his answer that he had in reality purchased the land from himself and his first set of associates— and not from Sherman—for himself and the second set, was it not incumbent upon him to go further and show that he had made the profit under such circumstances as that a court of equity would permit him to retain it, rather than upon complainants to show that he had made it in violation of his duty to them and in fraud of their rights? The relation between him and the other members of the syndicate was not, technically, that of trustee and beneficiaries, nor of principal and agent. The latter, however, is practically the relation existing between them upon the most favorable view of the facts as stated by Bateman himself. In the first purchase— made of Sherman—he acted for himself as principal and as agent of Leonard and Carr. In the second, he acted in the

capacity of vendor for himself, again as principal, and as agent for Leonard and Carr, and in the capacity of vendee for himself, a third time as principal, and as agent for the other members of the purchasing syndicate.

Equity will not permit one occupying this relation to others to make a profit in dealing with them. They have their option to rescind or claim their share of the profit. Mr. Pomeroy, in his excellent treatise, says of this principle, that, " it extends to every possible case in which a fiduciary relation exists *as a fact*, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation, and the duties involved in it, need not be legal; it may be moral, social, domestic, or merely personal." 2 Pom. Eq., Sec. 956; Id., Sec. 955. He also says that the relations of principal and agent are regarded in equity in the same general manner, and with nearly the same strictness, as that of trustee and beneficiary. Id., Sec. 959.

In the application of the principle, Lord Eldon said: " I am asked where that rule is to be found ? I answer, in that great rule of the court that he who bargains in matter of advantage with a person placing confidence in him, is bound to show that he made a reasonable use of that confidence; a rule applying to trustees, attorneys, or anyone else." *Gibson* v. *Jeyes*, 6 Ves., 278. See also *LeGendre* v. *Byrnes*, 44 N. J. Eq., 372.

In the case of *Smith* v. *Kay*, 7 H. L. Cas., 750, which arose out of an abuse of confidence, this doctrine was much discussed. Lord Cranworth said it was not necessary that the parties stand in a fiduciary relation (p. 771). Lord Kingsdown said: " The principle applies to every case where influence is acquired and abused, where confidence is reposed and destroyed " (p. 779). The Supreme Court of the United States also has said: " The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents, public and private; but the value of the prohibition is most felt, and its

application is more frequent, in the private relations in which the vendor and purchaser may stand towards each other." *Michoud* v. *Girod*, 4 How., 503.

In a case involving the relations of principal and agent in the sale of lands, the Supreme Court of Illinois said: "An agent may undoubtedly buy of his principal, or have an interest in the sale of property belonging to his principal; but in such case, the burden is upon the agent to show that the principal had knowledge, not only of the fact that the agent was buying or interested, but also of every material fact known to the agent which might affect the principal, and that having such knowledge, he freely consented to the transaction." *Tyler* v. *Sanborn*, 128 Ill., 136.

"An agent or broker employed to purchase for his principal cannot become the seller without notice to his principal." *Tewksbury* v. *Spruance*, 75 Ill., 187 ; *Keighler* v. *Savage Mfg. Co.*, 12 Md., 383 ; *Taussig* v. *Hart*, 58 N. Y., 425 ; 2 Pomeroy Eq., Sec. 959 ; 1 Story Eq. Jur., Secs. 311, 313.

We cannot do better than to close the discussion of this point with an apt quotation from a well-considered opinion of the Court of Appeals of New York. Admitting that ordinarily fraud must be proved, the court said: " Whenever, however, the relations between the contracting parties appear to be of such character as to render it certain that they do not deal on terms of equality, but that either on the one side, from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other hand from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced; that no undue influence was used; and that all was fair, open, voluntary and well understood." *Cornell* v. *Cornell*, 75 N. Y., 91. See also 1 Bigelow on Fraud, 261-265.

4. It is not necessary, however, to rest our decision upon this ground. Grant that the answer is evidence for the ap-

pellee, and must be overcome by proof on the part of the appellants, yet we think this has been done.

W. W. Dudley, who was intimately associated with Bateman, said that Bateman first suggested to him to take an interest in a syndicate that was being formed to purchase this ground at $65,000, to be divided into twenty-five interests, and told him it would be profitable. Witness told him he did not have the money, but would submit the matter to some friends who did. He wrote to Reeves and Ferguson, who lived in Indiana, and they sent a draft for $3,000 to be paid into the enterprise. Witness did not know anything of Bateman's purchase from Sherman for $50,500, or of his making a profit in the matter. Bateman drove him out to and showed him the land. It was his understanding that John Sherman, trustee, had been the owner of the property, and that it was in his name. Witness never had any knowledge of the contract between John Sherman, trustee, and defendant Bateman, by which Bateman was to acquire the property for the sum of $50,500.

S. S. Burdette, one of the complainants, said that he was approached by John E. Beall, the agent of Bateman, who had been a schoolmate of his then partner, W. E. Curtis, who took him out to see the property, and explained Bateman's plans to him. He said Bateman was desirous of controlling this particular property, which was substantially all that was left in Mr. Sherman's hands, and was willing to take a certain number of shares himself, leaving only two, which he desired Curtis & Burdette to subscribe for. He said the price to be paid Sherman was $65,000. Witness asked what was the particular desire of Bateman in going into it, and Beall said that he was satisfied he would make a good thing on his shares, and that he would expect to have control and management of the property, and the commissions for its sale would be a nice thing. Afterwards witness went to see Bateman himself, in company with Curtis, and recited to him all that he had been told by Beall, which Bateman confirmed. He also said that he had no knowledge or information that

Bateman, Leonard and Carr had purchased the property before this from Sherman, and never had any intimation that Bateman had obtained from Sherman a written contract for the sale of the property for $50,500 until after the commencement of this suit.

Bateman denied this statement, though he admitted having talked with both Curtis and Burdette about the purchase. He testified at length as to the purchase from Sherman, as stated in his answer, but does not say that he ever told any member of the syndicate the facts concerning the purchase or of the profit made in the second sale.

John E. Beall, who assisted defendant in forming the syndicate, was called as a witness by him, and admitted that he had talked with Burdette about taking an interest, and had shown him the situation of the property. He said that he, could not have made such a statement as Burdette testified to, "because the land had already been purchased by Bateman of Sherman. Whether or not I knew the price at that time I cannot recollect." He further said that he could not say positively if he, at that time, knew that Bateman was selling the property for one syndicate to another, of both of which he was a member, for a profit.

There were three persons whose testimony would probably have shed much light upon this inquiry, viz., Mr. Sherman, Mr. Leonard, and Miss Carr, but not one of them was called upon to testify.

In this state of the evidence, the recital in the deed of September 27, 1886, before mentioned, becomes specially important. This recital, that "said Bateman has heretofore, *for himself and as trustee for the parties hereto,* contracted to purchase from John Sherman the lands" . . . . "with the view of making sales thereof for the benefit of those interested who have contributed to the payments made on account of the purchase money," corroborates Burdette in this vital part of the case. Was this recital true? Or, if not true, was it made to deceive or to continue a deception practiced from the beginning? We cannot agree with appel-

lants in regarding this deed as an estoppel; but we do regard it as very strong and persuasive evidence which it was incumbent upon Bateman to explain. He said that he never saw this deed. When asked about its origin, all that he said was, "Ridout got it up." Ridout was a well-known attorney and examiner of titles in Washington. He was not called, though probably he might not have remembered this one transaction.

It is clear that he was not employed by complainants to "get it up." Who was most interested in getting up this deed in order to make clear Bateman's authority as trustee to sell and convey the lands of the syndicate? Everything points to Bateman. He was not only largely interested as a shareholder (for he held not only his own original interest, but also the subscription in the name of Leonard), but he was also the exclusive manager and agent for the sale of the property, through which, according to Beall, he would have "a nice thing" in the way of commissions. Other circumstances also point to his connection with the preparation, execution and record of the deed. The testimony of one of the signers showed that it was sent to him for execution in Massachusetts, either by Bateman or from his office. He acknowledged the execution in Bristol, Mass., September 28, 1886, and on September 29 it was 'executed by Ad. Meyer, another party interested, in the city of New York, where Bateman was then living and had an office. Meyer did not remember the circumstance of signing the deed, but did remember that he saw Bateman about that time and talked to him about this business. Testimony was offered to show that the word "Adolph" in the certificate to Meyer's signature was in the handwriting of Bateman, in the opinion of several witnesses. The original, together with an admitted letter of Bateman's, have been sent up for inspection and comparison; and, without being experts in such matters, we must say that there is a striking resemblance between the two.

Bateman was not recalled to contradict any of this evidence. Ridout must necessarily have received the informa-

tion contained in this recital either from Bateman or his representative, or from some member of the syndicate. If from Bateman, it convicts him directly of a false representation; if from one of his syndicate, it indirectly convicts him of the same thing; because this person, whoever he may be, must necessarily have acquired his knowledge from Bateman. Again, when Bateman was examined, he made, to say the least, a very lame explanation with respect to the receipt of the profits of this sale to the syndicate. It is evident that Leonard drew out of the speculation about the time of the formation of the syndicate. Bateman's memory with respect to this date and to the transactions with Leonard was very much at fault. This being one of the material matters of inquiry, it is strange that a man of his business capacity and methods should not have been able to make a statement of it accurate in dates and details and easy of comprehension. The burden was upon him to do this. We will not pursue this subject further, because under the decree which we shall render he will have another opportunity, for his own protection, to make this explanation to the Auditor.

After a careful examination of every fact and circumstance disclosed by the record, we are of the opinion that the defendant, Arthur E. Bateman, should account to the complainants for their due proportion of whatever profit he may actually have made of this transaction. His conduct towards those who confided in him has been such as no court of equity could refuse to condemn. Such schemes and practices may be, as has been suggested, commonly recognized as lawful in modern business, though we are loth to believe it. Whether this be true or not, promoters of enterprises and speculations, and organizers of syndicates must learn that no amount of successful practice or general acquiescence in such methods, can ever give them standing in a court of equity.

There is nothing in the case of *Kilbourn* v. *Sunderland*, 130 U. S., 505, which conflicts with our conclusion in this case; but, on the contrary, much that by analogy supports it.

In that case the "syndicate" employed Kilbourn & Latta, who had no share in the enterprise, as agents to buy certain lands for them, for which they advanced the money upon call. These agents secretly purchased some of the property and then turned it in to their principals at a higher price. For all such profits they were required to account. There was a certain square which the principals informed them they wished to buy, and in doing so named fifty cents per square foot as the price they were willing to pay for it. It happened that Kilbourn & Latta had, some time before their employment as agents, contracted to purchase the same square for a less sum. Without disclosing their interest, they caused the property to be conveyed to their principals, at the price named by them, and thereby made a handsome profit as well as commissions. The principals, after discovery of the fraud, held on to the land and sued to recover this difference. In denying the relief sought, the court said: "The relations between the parties were such that Kilbourn & Latta should have disclosed that they were acting as principals in this sale, but the complainants suffered no pecuniary loss for want of such disclosure, and they took the property at their own price. Their remedy, if they were deceived, lay in throwing up the bargain; but they did not do so, and could not treat it as a contract fulfilled and as a contract broken." In that case, as we have seen, the parties were in the market buying lands upon their own judgments, and they fixed the price which they were willing to pay. In this case, the parties went into partnership with the seller upon his urgent solicitation, unconscious of his adverse interest, and relying upon his integrity and superior judgment as to values, let him fix the price without question.

If in that case it had been made to appear that Kilbourn & Latta had suggested the speculation to Sunderland and associates and had taken a share in it, and had induced them to purchase the property at the price named, it cannot be doubted that they would have been required to account for the profit made through their fraudulent conduct. *Grant* v. *Hardy*, 33 Wis., 668.

So much of the decree as has been appealed from must be reversed, with costs to the appellants, to be paid by defendant, Arthur E. Bateman. The cause will be remanded to the court below, where it will be referred to the Auditor, to state the accounts of the complainants with said Bateman, who in doing so will charge said Bateman with the difference between the sum he contracted to pay Sherman for the property, viz., $50,500, and the sum for which it was sold to the syndicate, viz., $65,000, less such sums thereof as he may be able clearly to show that he paid over to William B. Leonard and Mary C. Carr, or either of them, as their shares of the profit made in the transaction; and state the amount of the fund on hand which each complainant is entitled to receive in the proportion that his subscription to the $25,000 cash fund bears thereto. And upon the coming in of said report the court below will pass a final decree in accordance with this opinion.

*Reversed.*