[No. 26744. Department Two. January 27, 1938.]

ALTON L. COLLINS, *Appellant*, v. E. LOYD NELSON *et al.,*
*Respondents*, GILT EDGE MINES, INC.,
*Cross-Appellant.*[1]

[1]Reported in 75 P. (2d) 570.

*John Kelleher,* for appellant.

*Allen, Froude & Hilen,* for respondents.

STEINERT, C. J.—Plaintiff brought this action to recover for the loss of moneys paid by him on his two promissory notes previously executed and given in the purchase of certain mining stock which was to have been placed in escrow, but which was never done. Recovery was sought against both individual and corporate defendants on the ground of fraud, breach of confidential relationship, and misappropriation to defendants' use of the moneys paid by plaintiff. Upon a trial by the court, without a jury, a decree was entered dismissing the action against the individual defendants, but awarding recovery against the corporate defendant. Plaintiff has appealed from that portion of the decree which denied him recovery against the individual defendants, and the corporate defendant has cross-appealed from that portion of the decree awarding recovery against it. Upon the appeal, plaintiff, as appellant, has also moved to dismiss the cross-appeal on the ground that it was not timely or properly taken.

The facts are somewhat involved and will require a detailed statement in order that the issues and the contentions of the respective parties may be clearly understood.

Appellant resided in Ostrander, a small town in the southern part of Washington. For many years he had been engaged in the lumber business; from time to time he had made investments in mining stock; and on numerous occasions he had executed promissory notes. He became acquainted with respondent E. Loyd

Nelson at a social function about a year prior to December, 1933, but had never had any business dealings with him until November of that year.

Respondents Nelson are husband and wife. Mrs. Nelson had no connection with the transactions involved in this suit, and we, therefore, will hereinafter refer to E. Loyd Nelson as though he were the sole respondent.

Mr. Nelson, a resident of Seattle, owned a large block of stock of Los Lugos Gold Mines, Inc., a Washington corporation, of which he was president, in October, 1933. At the same time, he owned considerable stock of Gilt Edge Mines, Inc., also a Washington corporation, of which he became president and manager in October, 1933. At that time he was endeavoring to dispose of his holdings in Los Lugos Gold Mines, Inc., and terminate his connection with that company, in order that he might give more attention to the business of Gilt Edge Mines, Inc. By December 15, 1933, Nelson had sold all of his stock in Los Lugos Gold Mines, Inc., and had resigned from the presidency thereof. In January, 1934, besides being president and manager of Gilt Edge Mines, Inc., he owned twenty per cent of its stock. During all of the time referred to herein, Mr. Gerald DeGarmo of Seattle was secretary of Gilt Edge Mines, Inc.

Lyman Reed, brother-in-law of Nelson and a resident of Seattle, was a stock broker engaged in selling the stock of both Los Lugos Gold Mines, Inc. and Gilt Edge Mines, Inc. In May, 1933, he had entered into a contract with Gilt Edge Mines, Inc., whereby he had agreed to buy a certain amount of stock of that corporation at $12.50 per share. This stock he was, in turn, selling at $15 per share, thereby realizing a substantial profit for himself. During the latter part of

1933, Reed was particularly interested in trading his clients out of the Los Lugos stock and into the Gilt Edge stock. Although he is not a party to this suit, he is the individual directly responsible for the present controversy. It is alleged that he is now insolvent.

On November 29, 1933, Reed and Collins entered into a contract wherein Reed agreed to sell, and Collins agreed to purchase, 64,000 shares of Los Lugos stock, which included the last of Nelson's holdings in that company, amounting to 33,000 shares. Under the terms of that contract, all of the stock so purchased from Nelson and the notes given for the same by Collins were placed in escrow with a Seattle bank, and a receipt was given therefor to Nelson to be held by him until Collins' notes were paid. That transaction is not affected by this suit, and we mention it here merely to show the antecedent relations between the parties.

The present controversy had its origin on December 15, 1933. On that day Reed and Collins entered into a second contract, a written memorandum of which was made, reading as follows:

"This agreement made at Ostrander, Washington, this fifteenth day of December, 1933; between Lyman Reed, first party and Alton L. Collins, second party. Witnesseth

"Lyman Reed is selling Alton Collins twenty four thousand (24,000) shares of Los Lugos Gold Mines, Inc. stock at the rate of seven cents per share. This is a receipt by Lyman Reed to Alton Collins for the full purchase price of $1,680.00. Purchase price consists of $280 cash, $400 ninety day note, and $1,000 five month note. It is understood that Lyman Reed shall place said 24,000 shares of stock (If pooled stock he shall place a boni fide transfer thereof) up with E. Lloyd Nelson, for him to hold as escrow agent until said notes are paid in full. It is further understood that above mentioned notes shall not be sold until

stock is up with escrow agent and agent has notified Alton Collins of same.

"Signed on above date

"LYMAN REED

....................................................................

. ....................................................................

...................................................."

The stock mentioned in the foregoing memorandum was not any part of Nelson's former Los Lugos holdings, but belonged to one E. H. Urban of Bremerton, Washington.

At the time that the agreement just mentioned was made, Collins paid Reed $280 cash and delivered to him the two negotiable promissory notes involved in this action, amounting to $1,400 and made payable to Reed. At about the same time, Reed mailed to Nelson, in Seattle, an unsigned carbon copy of the written memorandum, but did not enclose therewith the notes nor any Los Lugos stock. No letter of explanation was sent by either Reed or Collins. Nelson received the carbon copy of the memorandum in due course, and, there being no accompanying directions, placed it beneath a blotter on his desk. Some time later, Reed discussed with Nelson the terms of the arrangement as provided in the memorandum, but did not deliver the notes or any stock as contemplated therein. The matter stood thus until some time in January, 1934, when it became further complicated by reason of certain other transactions which then took place.

It appears that, during the winter of 1933-1934, Gilt Edge Mines, Inc., had been negotiating with Johnson Manufacturing Company of Seattle for the purchase from the latter company of a Diesel engine and certain mining equipment. Reed, learning of the negotiations, contacted DeGarmo, secretary of Gilt Edge Mines, Inc., and told him that he could obtain some notes which could be used by Gilt Edge Mines, Inc.,

in financing the intended purchase, provided that he, Reed, was given credit in the amount of such notes upon the contract that he had with Gilt Edge Mines, Inc., for the purchase of its stock. Reed did not at that time disclose whose notes could thus be obtained.

DeGarmo then suggested that, if Reed could induce Johnson Manufacturing Company to accept such notes as payment on the machinery and equipment, Reed would be allowed an equal credit by Gilt Edge Mines, Inc., upon his contract for stock. During the month of January, 1934, DeGarmo inquired of the president of Johnson Manufacturing Company whether a satisfactory arrangement had been made with Reed for the acceptance and application of any notes on the prospective purchase, and was told that there had been, but at that time no mention was made of the maker of the notes.

On January 19, 1934, Gilt Edge Mines, Inc., through Nelson, its president, placed its order with Johnson Manufacturing Company for the Diesel engine and mining equipment. The invoice price thereof amounted to $6,284.40, of which there was paid in cash $500 and a credit allowed in the sum of $2,100 for notes turned in and $1,250 for Gilt Edge stock delivered, making a total credit of $3,850, the balance of $2,434.40 being charged on open account. The invoice did not disclose whose notes had been received by Johnson Manufacturing Company.

It appears that in these negotiations Reed, on January 19, 1934, endorsed over and delivered to Johnson Manufacturing Company Collins' notes amounting to $2,100, two of which are the notes involved in this action. This act on the part of Reed was in direct violation of his contract with Collins, for the reason that no part of the Los Lugos stock mentioned in the agreement had been placed in escrow by Reed. On

the same day, Reed wrote to Collins with reference to a number of matters and in his letter mentioned the fact that he had turned in the notes on the purchase of a Diesel engine and compressor by Gilt Edge Mines, Inc., from Johnson Manufacturing Company.

Also, on January 19, 1934, Nelson, who was then contemplating an extended trip throughout the east, wrote to Collins, informing him of the amount of Los Lugos stock held by him in escrow, which, however, did not include the stock involved in this action; in the letter Nelson further advised Collins that Mr. Urban had in his possession the stock with which we are here concerned, the same to be delivered by Urban when the notes covering the same were paid by Collins.

Collins received Reed's letter on January 20th and, being somewhat disturbed by the information that Reed had negotiated his notes, immediately came to Seattle, according to his testimony, for the purpose of either requiring Nelson to safeguard his purchase of the Los Lugos stock or else of directly notifying Johnson Manufacturing Company that he, Collins, would not honor his notes. Collins testified that, in a conference with Nelson on that day, Nelson orally promised that he would perform the escrow stipulation in the contract of December 15th between Collins and Reed, by personally, or through a responsible agent, picking up the Urban stock on or about February 5, 1934, and holding the same, together with the stock already held by Nelson under the prior agreement of November 29th.

There is a serious dispute in the record as to whether or not Collins actually saw Nelson on that occasion. Collins insists that he did; Nelson insists that he did not. The court found that Nelson and Collins had met in Seattle on January 20th and that Nelson had then and there made an oral statement to Collins, the effect

of which was a guaranty of performance by Nelson of the contract between Reed and Collins by Nelson's personally obtaining the Los Lugos stock then in escrow at the bank in Seattle. For the purposes of this case, we accept the finding of the court that Nelson orally promised that he would secure and hold the Urban stock.

Nelson left Seattle on the morning of January 21st and did not return until March 10th following.

During Nelson's absence from Seattle, and in the early part of February, 1934, Mr. Eric Johnson, president of Johnson Manufacturing Company, advised Mr. DeGarmo, secretary of Gilt Edge Mines, Inc., that the notes received by his company on the sale of the Diesel engine to Gilt Edge Mines, Inc., were the notes of Collins which Reed had endorsed over to it. He also then requested that the notes be endorsed by Gilt Edge Mines, Inc., the purchaser of the equipment. Mr. DeGarmo agreed to have this done and requested that the notes be brought to his office. The notes were subsequently delivered as requested. Some time thereafter, however, and while Nelson was still in the east, Johnson advised DeGarmo that Johnson Manufacturing Company no longer desired the endorsement of Gilt Edge Mines, Inc., but preferred to have an open charge against the latter company for the amount of the notes rather than to have the notes themselves. It was thereupon agreed that the amount of the notes should be charged to Gilt Edge Mines, Inc., and that the notes should be held by that company as its own property. No debit memorandum of such transaction, however, was sent to Gilt Edge Mines, Inc., by Johnson Manufacturing Company at that time.

On Mr. Nelson's return to Seattle about March 10, 1934, no debit memorandum having yet been received from Johnson Manufacturing Company, Mr. DeGarmo

took the notes to Nelson and had them endorsed by him in conformity with DeGarmo's original agreement with Johnson. A few days thereafter, however, the debit memorandum was received from Johnson Manufacturing Company, and the notes were thereupon regarded as the property of Gilt Edge Mines, Inc.

As the notes matured, Collins was notified and paid the amounts due thereon to Gilt Edge Mines, Inc. As payments were made on the notes, Gilt Edge Mines, Inc., credited Reed's stock account and issued to him stock of Gilt Edge Mines, Inc., in accordance with their agreement of May, 1933. The last of Collins' notes was paid in May, 1934. At no time did Collins, on paying his notes, demand any stock.

This action was begun in January, 1936, upon the charge that Nelson had been guilty of deceit in failing to notify Collins, before Collins paid his notes, that Nelson did not have the Urban block of stock in his possession, and, further, that Nelson and Gilt Edge Mines, Inc., had misappropriated the moneys so paid by Collins.

We shall first consider appellant's motion as to the cross-appeal of Gilt Edge Mines, Inc.

The decree was entered March 5, 1937, after due notice to all parties in the action. The cross-appeal, so termed, was taken April 14, 1937. Whether it be considered as an original appeal or as a cross-appeal, it was not timely. Rule of Practice X (159 Wash. lxiv, Rem. Rev. Stat., § 308-10 [P. C. § 8676-13]); Rule of Practice XVIII (178 Wash. xl, Rem. Rev. Stat. (Sup.), § 308-18 [P. C. § 8676-13b]). The motion to dismiss the cross-appeal is granted.

We next proceed to the merits of the case as presented by Collins' appeal from the decree dismissing his complaint against Nelson.

The theory upon which appellant sought recovery

was that Nelson and Gilt Edge Mines, Inc., had full knowledge of the terms and conditions of appellant's agreement with Reed at the time that it was made and, with such knowledge, had subsequently come into possession of appellant's notes; that Nelson, having such knowledge, promised and assured appellant that the Los Lugos stock, which was the consideration for appellant's notes, would be ready for delivery to him when his notes were paid; that, relying on such promise and assurance, appellant had paid the notes as they matured; and that Nelson and Gilt Edge Mines, Inc., notwithstanding their knowledge of these facts, fraudulently, deceptively, and without notice to appellant that his rights were being impaired, had appropriated to their own use the proceeds of the notes upon payment thereof by appellant.

The proof, however, so far as Nelson was concerned, went no further than that Nelson had orally promised, on January 20, 1934, which was after the notes had been negotiated by Reed to Johnson Manufacturing Company, that he would perform the escrow stipulation contained in the contract between Reed and appellant, and that he would personally or by some responsible agent pick up the Urban stock then in escrow and hold it until Collins paid the purchase price thereof as represented by his notes.

The court held that the evidence was insufficient to establish fraud on the part of Nelson, and that appellant's cause of action must be rested on the oral statements made by Nelson on January 20, 1934. In its decree, the court specifically found that the oral promise on which such cause of action rested was within the inhibition of the statute of frauds, and for that reason dismissed the complaint as against Nelson.

Anticipating, for the moment, appellant's contentions as contained in his brief, we agree with

the trial court that the oral promise made by Nelson in his conversation with Collins was wholly insufficient to establish fraud on the part of Nelson. Assuming, as the court found, that the promise was in fact made, it was nevertheless nothing more than a promise without any binding legal effect upon Nelson.

If it were an original, or direct, promise on the part of Nelson, then it was unenforceable as to him because there was no consideration whatever moving to Nelson. The promise was wholly gratuitous on his part.

If, on the other hand, it was a promise to answer for the debt, default or misdoing of Reed, as the court found it to be, then it was clearly within the statute of frauds, Rem. Rev. Stat., § 5825 [P. C. § 7745], because neither the promise nor any memorandum thereof was in writing. The cases illustrating the application of the statute are set forth at length in the footnotes thereto, and it is therefore unnecessary to cite them here. They are uniform in upholding the statute.

It is immaterial whether Reed's act in negotiating the notes contrary to his agreement had the effect of rendering him liable to Collins as for a debt, or whether his failure to procure the Los Lugos stock before negotiating the notes be regarded as a default or misdoing. In either, or any, event Nelson's promise was to do something that Reed had obligated himself to do, and whether or not Gilt Edge Mines, Inc., ultimately received some benefit from Reed's misconduct, there was no benefit or consideration running to Nelson other than what may have accrued to the corporation. The promise not being in writing, it will not support an action. *Jannsen v. Curtis*, 182 Wash. 499, 47 P. (2d) 662.

Appellant, however, contends that his cause of action is not based upon breach of contract, but,

rather, sounds in tort for fraud and deceit. The theory upon which this contention is made is that a confidential relation existed between Nelson and Collins, and that, because of such fact, it was the duty of Nelson, at the time that Collins paid off the notes, to inform Collins that the Urban stock was not in Nelson's possession nor ready for delivery to Collins.

The court did not find, nor are we able to discover from the evidence, that there was any confidential relation existing between Nelson and Collins. It is true that there had been some social contact and friendly relations, as well as one prior business transaction between them, but there was no relation which, in law, could be said to be confidential. The social relations were casual, and the prior business deal involving the sale by the one and the purchase by the other of certain stock had been conducted at arm's length.

To establish a fiduciary relationship upon the violation of which fraud is sought to be based, there must be something more than mere friendly relations or confidence in another's honesty and integrity. There must be something in the particular circumstances which approximates a business agency, a professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which he otherwise should, and ordinarily would, exercise.

In his interview with Nelson on January 20th, Collins did not come as one ignorant of an existing situation or as one relying on past relations of trust and confidence; he came with militant purpose, chagrined and irritated at Reed's misconduct, and determined either to secure the promise of Nelson to do what Reed had agreed but failed to do, or else to take steps to repudiate his notes. With reference to the latter alternative, his cause was hopeless, because the notes

had already come into the hands of Johnson Manufacturing Company, a holder in due course, and appellant's liability thereon was therefore fixed and determined. The result of the interview, then, was that Collins secured from Nelson simply a promise thereafter to pick up and hold the Urban stock. However, as we have already stated, the promise of Nelson, being without consideration, was not enforceable against him as an original, or direct, promise, and, not being in writing, was within the inhibition of the statute of frauds.

The decree is affirmed.

ROBINSON, BEALS, MILLARD, and GERAGHTY, JJ., concur.

[1]Reported in 75 P. (2d) 575.