[No. 37815.    Department One.    February 10, 1966.]

JOANNA HARVEY MOON, *Respondent*, v. EVERETT R. PHIPPS *et al., Appellants.**

*Reported in 411 P.2d 157.

*McMullen, Snider & McMullen,* for appellants.

*Ned Hall,* for respondent.

HALE, J.—Joanna Moon had never met Dr. Woolery until the day after her stroke. Sixty-one years of age, widowed, and living with her 91-year-old aunt in the latter's home, she awoke the morning of May 19, 1962, to find her entire

left side paralyzed; she could move neither her left leg nor arm. Her aged aunt called Dr. Woolery the next day and he said that the stroke had taken place about 24 hours earlier. In his first examination, he noted that Mrs. Moon was moderately confused but not comatose, paralyzed on her left side from an acute cerebral accident or stroke; and in a severe state of physical as well as mental depression.

Dr. Woolery sent Mrs. Moon to the hospital for 4 days and then transferred her to a nursing home for continuous observation, treatment and rehabilitation during the next 4 months. On leaving the nursing home, she continued treatments from Dr. Woolery, reporting at intervals to his office. During the course of and as a part of his therapy, he sought to alleviate her feelings of financial insecurity by advising her to sell her farm, and recommended his father-in-law as the agent to help her.

It came about in this way:

The doctor noted that, as her physical symptoms from the stroke subsided, her emotional symptoms persisted. In January, 1963—over 6 months after the stroke—she was markedly depressed, withdrawn, disinterested, and had an inordinate inclination to reminisce; she was becoming more apprehensive, suspicious, hostile and restless. The doctor characterized these symptoms as forming a prepsychotic neurosis, which, under certain kinds of stress or stimuli, might develop into a suicidal psychosis, or withdrawal into a schizophrenic or paranoid response, or into some other defensive type of withdrawal reaction. Her physical condition, however, improved until she could get around somewhat unsteadily with a leg splint.

Dr. Woolery's treatment included drugs and psychotherapy, for he believed her emotional symptoms were interrelated to her physical problems. During January and February, at his direction, Mrs. Moon was taking prescribed dosages of Stelazine as a tranquilizer, Parnate as antidepressant, Enduron for her hypertension, Butisol for restlessness, and Deprol because of an added agitated depression which the doctor noted. Although the doctor was

a specialist in internal medicine, he felt obliged to resort to psychotherapy in treating Mrs. Moon because of her serious emotional problems.

He employed a kind of therapy whereby the patient is said to ventilate her feelings by talking about personal problems; and in so doing he noted that her ownership of a run-down farm was the source of several unhappy emotional responses. The farm, he concluded as she talked of it and her life in connection with it, was related in her feelings to the accidental death of her father and the suicide of her husband. It was run-down, producing very little, and thus a contributing cause to her anxiety and feelings of insecurity and related to her other emotional symptoms. He said that she repeatedly told him she received very little income from the farm, and he identified this in part with her sense of financial insecurity. As one phase of psychotherapy, he advised her to sell the farm, recommending his father-in-law as a person whom she could trust. Dr. Woolery testified:

I said, "Why don't you try to get rid of it? It might help you financially, improve your security," which she mentioned she was becoming financially unsecure and her future did not have much security in it. So I encouraged her early in the course of events to try to get this taken care of. She mentioned that she did not trust anybody, was afraid to do anything with it, so I dropped the subject. But as I talked with her the subject kept coming up, so finally sometime in November or December, I am not sure when, I can't recall the exact date, the point came up again, and I said that if she would—Q. . . . When is this? A. I am not sure the exact time. November or December, somewhere around there, the subject came up again and I again asked her why didn't she do something about it, get rid of it, sell it, have somebody manage it for her, and she pointed out she couldn't trust anybody, so at this point I said, "Well, would you trust me to advise you or turn you over to somebody who might help you?" And she did have a lot of faith and trust in me at that point. I mentioned that the only person I knew who I felt I could trust with regard to real estate was my father-in-law, and I gave her his name and gave him her name. And she said that would be all

right, hoping that this would help her with this problem. I was only interested in helping her.

Mrs. Moon, acting on this suggestion, telephoned defendant Everett R. Phipps, Dr. Woolery's father-in-law, who came from his home in Portland a few days before Christmas, 1962, to look the farm over.

It consisted of 100 acres of land in Clark County on which the buildings were so ramshackle and in such disrepair as to have little value; but many open fields and orchards and its location 7 miles northwest of Vancouver and a creek bordering its north boundary gave the farm genuine value. In 1955, the land alone had been appraised at $18,700 by three realtors. The trial court found it had a value of $25,000 in 1962.

In January, Phipps drove Mrs. Moon to his home in Portland where his wife served her coffee and cookies, and he prepared a one page written legal instrument which Mrs. Moon testified she thought to be a listing agreement. She said that he made a telephone call to see if a notary public would be available, and later that afternoon he took her to an office where she signed the paper in the presence of a notary public. The only thing she noted about the instrument, she said, was that it contained a legal description of her farm. The instrument, which Mrs. Moon says she thought to be simply a listing agreement, turned out to be a 60-day, irrevocable option to Mr. Phipps to buy the farm for $12,500 at $1,000 down and $150 per month. It contained a rather curious provision as to the payments, which were to be made "during the life time" of the seller until fully paid.

Thus, Mrs. Moon says, and the court so found, that she consulted with and engaged Everett R. Phipps as her agent to sell her farm at the best price obtainable; she learned that she had signed an option agreement—later filed for record by the defendants—giving Phipps the power to buy for $12,500 a farm reasonably worth $25,000. Plaintiff brought this action to rescind and cancel the option agreement, quiet title to the lands in her against any claim de-

fendants husband and wife might assert, and to bar them from asserting any claims thereunder.

She alleged that the option agreement had been obtained from her by fraud and deceit. From a decree based not on specific findings of fraud but on a finding that defendant Phipps breached a fiduciary relationship, defendants appeal, and the decision turns on whether the relationship between the parties was a fiduciary one or merely an agency.

The trial court, on substantial evidence, seeing in Mrs. Moon adequate mental capacity and judgment to understand the nature and purposes of the transaction and to comprehend her dealings with the defendants, found plaintiff mentally competent to contract. It found, too, that she employed defendant Phipps "to sell her property for the best price obtainable;" and that she neither contemplated nor intended giving him an option to buy the property for $12,500 on terms of $150 per month or at any price.

Finding the option price of $12,500 inadequate on property worth $25,000, the court, nonetheless, held the price not so grossly inadequate as to shock the conscience of the court and refused to grant rescission solely on that ground. The court did, however, grant full relief on the basis of breach of fiduciary trust as described in finding of fact 9:

> That defendant Everett R. Phipps breached the fiduciary relationship which existed between him and the plaintiff in attempting to deal with the property to his advantage and at plaintiff's expense; that he failed to exercise the utmost good faith required of a fiduciary by proposing an unfair agreement which was not in plaintiff's best interests.

We observe that all findings of fact challenged by assignment of error were supported by substantial evidence and, accordingly, find it necessary to discuss only the question of a fiduciary relationship.

Did a fiduciary relationship between defendant agent and plaintiff principal exist? If so, did defendant agent breach his duty as a fiduciary?

■ A simple reposing of trust and confidence in the integrity of another does not alone make of the latter a fiduciary. There must be additional circumstances, or a relationship that induces the trusting party to relax the care and vigilance which he would ordinarily exercise for his own protection. *Collins v. Nelson,* 193 Wash. 334, 75 P.2d 570 (1938). Nor would the circumstances that plaintiff was a widow in poor health, without family, under severe emotional stress, and taking a number of powerful drugs, convert an ordinary agency into a fiduciary relationship, for every sick and emotionally dependent person of advanced years does not, merely in listing his property for sale with a real estate agent, make of the latter a fiduciary with respect to the listed property.

■ In determining whether Phipps was a fiduciary, we start with the premise that an agent cannot have an interest in the sale of his principal's property without the consent of his principal freely given pursuant to full disclosure of all matters known to the agent which might affect the principal's judgment. If employed to sell, the agent may not become the purchaser; and if employed to buy, he may not become the seller, except in each instance with the explicit knowledge and consent of his principal. And the agent has the burden of proving in every case that his principal not only had knowledge that the agent was to be the buyer or seller, but also the burden of showing that all information in possession of the agent had been communicated to his principal prior to the giving of consent.

■ Loyalty is the chief virtue required of an agent. Failure to make a full disclosure of all facts within the agent's knowledge having to do with the transactions will warrant the court's setting the transaction aside at the behest of the principal. *Breedlove v. Holton,* 143 Wash. 347, 255 Pac. 132 (1927); *Stewart v. Preston,* 77 Wash. 559, 137 Pac. 993 (1914); *Watson v. Bayliss,* 62 Wash. 329, 113 Pac. 770, 34 L.R.A.(n.s.) 1210 (1911). This loyalty demanded of an agent by the law creates a duty in the agent to deal with his principal's property solely for his principal's benefit

in all matters connected with the agency. Restatement (Second), Agency § 387 (1958).

Whether a fiduciary relationship emanates from such an arrangement, or grows out of it, depends in each case on the particular circumstances. The fiduciary relationship usually derives in part from an agency however created, whether expressly or by implications of law or fact, to which are added such circumstances as may induce the principal to relax the care and vigilance which the law ordinarily requires of him and he would customarily exercise on his own behalf. *Collins v. Nelson, supra.*

The evidence in this case discloses a number of circumstances which, when added to the agency, support the court's finding of a fiduciary relationship. First, we have evidence of special trust and confidence generated by the doctor and patient relationship. Then, we have a vicarious transfer of that trust and confidence through the doctor's psychotherapy and advice from the plaintiff to defendant Phipps, and her engaging him to procure a purchaser for her property at the best price and terms obtainable. Finally, instead of employing Phipps as her agent, she unwittingly conferred upon him a temporary legal title to her farm, giving him both the power of alienation over and the profits to be derived therefrom.

Under these circumstances, plaintiff need not prove actionable fraud and misrepresentation as elements for rescission. Proof that defendant Phipps assumed a fiduciary relationship and a breach of the fiduciary duty alone would be sufficient to warrant rescission and cancellation of the option by which he obtained legal dominion over the realty. The instrument which clothed the defendant, Everett R. Phipps, with legal power to either purchase as a buyer or sell to others as owner of the legal title made of him a fiduciary.

In acquiring legal dominion and control over his principal's property without making a complete disclosure of all information in his possession as to his legal powers to treat the property as his own, his intentions as to disposition of the property, and his opinion as to its true value,

Phipps not only breached his duty as a fiduciary, but his responsibility as an agent generally. Restatement (Second), Agency § 390 (1958); also see, Restatement (Second), Trusts § 2, and comments thereto at 6 (1959).

■■ When, therefore, by virtue of an agency relationship, an agent, without the knowledge and consent of his principal, acquires dominion over and control of his principal's property in such a way that the agent possesses a legal power to alienate the principal's interests in or possessory rights thereto, the agent has transformed the agency into a fiduciary relationship. A fiduciary, in handling another's property, must exercise the utmost good faith, disclose fully all facts relating to his interest in and his actions affecting the property involved in the fiduciary relationship, and deliver over to the party for whom he is acting all benefits derived from or inuring to the property from the breach.

The judgment is, therefore, affirmed.

HILL, OTT, and HUNTER, JJ., and LANGENBACH, J. Pro Tem., concur.