[No. 38900.    Department Two.    October 19, 1967.]

VALLEY LAND OFFICE, INC., *Respondent and Cross-appellant,*
v. WILLIAM O'GRADY, *Appellant,* JULIA O. SWAIN *et al.,*
*Respondents,* KENNETH LANE *et al., Respondents*
*and Cross-appellants.*\*

*\*Reported in 432 P.2d 850.

248

*Albert, deMers & Westgard, Harrison H. deMers, Douglas F. Albert, M. K. Westgard,* and (*Joseph D. Mladinov,* of counsel), for appellant.

*Curran, Kleweno & Curran* and *Charles P. Curran,* for respondent and cross-appellant.

NEILL, J.—Valley Land Office, Inc., brings action against William O'Grady to collect a realtor's commission pursuant to a sale of real estate, and against Fisher Realty, et al., for tortious interference with a contractual relationship. Mr. O'Grady counterclaims for damages based upon fraud, negligence and breach of fiduciary duty. At the close of plaintiff's case, the action against Fisher Realty, et al., was dismissed by the trial judge. At the close of O'Grady's case, the trial judge took the case from the jury, dismissed O'Grady's counterclaim and awarded the plaintiff $15,000

commission. From this judgment, O'Grady appeals and Valley Land Office, Inc., cross-appeals from the order dismissing Fisher Realty, et al.

█ Since the trial judge took this case from the jury and entered judgment for the plaintiff, we are bound to accept as true all of the defendant's evidence including every reasonable inference therefrom. *Smith v. Keating*, 52 Wn.2d 391, 326 P.2d 60 (1958).

William O'Grady, a 60-year-old farmer with less than a ninth grade education, is the co-owner of a 377-acre farm located about 6 miles east of Auburn. His brothers and sister have an interest with him in the farm by virtue of the terms of a devise from their mother. Mr. O'Grady has not actively farmed the land since 1956. He makes a small living off the land by renting some of the pasture land. The Green River flows through a portion of the property giving the acreage ¾ of a mile of water front.

April 15, 1963, Mr. O'Grady's friend of 17 years, David Cedergren, began working as a real estate salesman for Valley Land Office, Inc. Prior to this, Mr. Cedergren had operated a dairy farm some 3 miles from Mr. O'Grady and had occasionally employed him on the farm. On May 1, 1963, Mr. Cedergren contacted Mr. O'Grady and requested an exclusive listing of his property for 90 days. Mr. O'Grady went along with his friend and on May 3rd signed an "Authority to Sell Real Estate" with plaintiff. Mr. O'Grady also advised Mr. Cedergren that the highest bid he had received on the property was $135,000. Mr. Cedergren said that they would use that as a starting point but that they could get much more than that for the property. Mr. Cedergren advised Mr. O'Grady not to advertise the property because this would only bring in the "riffraff" with no money to pay down. He also informed Mr. O'Grady that their office had contacts in California and all over the nation. However, at trial it was shown that the broker had contacted only six persons, all local residents.

On May 15, 1963, the agent, Mr. Cedergren, took Mr. Lane, the owner of Valley Land Office, Inc., to see the O'Grady farm. Mr. Lane looked at the property and suggested to Mr. O'Grady that he sell the farm to a friend for the appraised value in the mother's estate and then buy it back. In this way, he could cut out the brothers and sister who had an interest in the property. Mr. O'Grady rejected the broker's scheme.

In June of 1963, Mr. Cedergren contacted Mr. Fiori, an attorney, and advised him that the property was for sale for $150,000, and took him to view the property. Mr. Fiori expressed an interest in the property and indicated he would contact them later.

July 12, 1963, Valley Land presented to Mr. O'Grady an option agreement to purchase the land for its own account for $125,000. They did not inform Mr. O'Grady that anyone was interested in the property. Mr. O'Grady was reluctant to sign the agreement. He determined he should see an attorney on the matter. The attorney advised him that the option was too long, the price too cheap, and a piecemeal deed-release provision therein permitted the buyer to "high grade" the land. Mr. O'Grady returned to Valley Land and informed the broker and agent of what the attorney had said. They assured him that they would try to work out a better contract deleting the bad features disapproved by the attorney.

Shortly thereafter, Mr. Fiori contacted Valley Land to obtain an option on the property. The option provided that piecemeal release of acreage would be by mutual consent of the buyer and seller. Mr. Fiori would not agree to this so a provision was put in the option whereby he alone would decide which acres would be released. Mr. O'Grady was asked to come to the office of Valley Land. On August 1, 1963, Mr. O'Grady met Mr. Cedergren and Mr. Lane at Valley Land office where Mr. Fiori was also present. Mr. O'Grady was presented with the option to purchase his property for $150,000. At the time, Mr. O'Grady had a severe headache and his acid-burned arm was bothering

him. He told the broker that he was not feeling well and thought he should take the agreement to his attorney. The broker assured him that that was not necessary since an attorney had already looked at it and all the objections raised by his attorney had been met. The agent, Mr. Cedergren, told him that he could rely on them that the contract was all in order. No one told Mr. O'Grady that a change had been made in the deed-release provision. No one told him that the option would permit the buyer to strip the acreage of its most valuable land and leave the seller with the balance. No one told him that the payment provision of the option permitted the purchaser to take over 20 years to pay for the land. When Mr. O'Grady asked if Mr. Fiori was the buyer, the broker and the agent incorrectly stated that the buyers were four men from Midway, and that Mr. Fiori was merely their attorney. They also told Mr. O'Grady that two of the buyers were ready to withdraw their offer if he didn't sign the contract immediately. Mr. O'Grady signed the option. The $500 that Mr. Fiori paid for the option was placed in the trust account of Valley Land, but Mr. O'Grady was never informed of this.

At the same time the Fiori option agreement was signed, a commission agreement was prepared by Valley Land and executed by Mr. O'Grady and Valley Land. A commission of 10 per cent was agreed upon in the original listing agreement. Mr. O'Grady had been told that this was the minimum commission allowable. However, this was incorrect, as the minimum commission on this type of sale in the south King County area is 10 per cent of the first $100,000 and 5 per cent above. Further, the commission agreement provided for a commission fee of $22,000, instead of a commission fee of $15,000. Out of this $22,000, Valley Land was to pay the 1 per cent tax, the prorated taxes, title insurance policy premium, surveying costs required by the purchaser, and any subdivision and plat report cost. Whatever remained of the $22,000 after payment of all of these costs was to be the commission of Valley Land. The buyer had never requested any survey of the property nor did he

expect the seller to pay for any costs of platting or subdividing. So, instead of ending up with a commission of $15,000, the artful handling of the commission agreement would net the broker around $19,000.

Shortly thereafter, Mr. O'Grady went to an attorney. He then, through his attorney, wrote Mr. Fiori that he was rescinding the option agreement. Mr. Fiori commenced an action against Mr. O'Grady demanding performance of the option agreement. The court at that trial ordered Mr. O'Grady to either perfrom the contract or pay Mr. Fiori $25,000. Mr. O'Grady paid the $25,000. The total cost of this sale contract termination as alleged by Mr. O'Grady, including attorneys' fees and financing costs, was $50,631.

█ Mr. O'Grady's position in the case at bar depends entirely on the nature of his relationship with the real estate brokers. The relationship is that of principal and agent. We are not here dealing with two contracting parties dealing with one another at arms' length. 2 Restatement (Second) of Agency (1958), p. 171, summarizes quite succinctly the duties owed by an agent to his principal:

> However, although the agency relation normally involves a contract between the parties, it is a special kind of contract, since an agent is not merely a promisor or a promisee but is also a fiduciary. Because he is a fiduciary and is subject to the directions of the principal, the rules as to his duties to the principal are unique.

In *Cantwell v. Nunn*, 45 Wash. 536, 540, 88 Pac. 1023 (1907), cited with approval in *Westerbeck v. Cannon*, 5 Wn.2d 106, 121, 104 P.2d 918 (1940), this court pointed out that

> The law exacts of every agent the utmost fidelity to his principal. He must keep him fully informed as to all his transactions, and the state of the business or interests entrusted to him. Any departure from these rules is a fraud in law.

Although *Moon v. Phipps*, 67 Wn.2d 948, 411 P.2d 157 (1966), would distinguish between an agency relationship and a "fiduciary-agency" relationship, and both parties

herein cite and rely on that case to support their respective positions, we have as recently as *Farrell v. Score*, 67 Wn.2d 957, 411 P.2d 146 (1966), recognized that a broker stands in a fiduciary capacity to his principal when acting for his principal within the scope of the agency. Further, even if we follow the language of *Moon, supra,* p. 954, that

There must be additional circumstances, or a relationship that induces the trusting party to relax the care and vigilance which he would ordinarily exercise for his own protection.

before a fiduciary duty arises, we have no hesitancy on the record before us in finding such circumstance and relationship.

The main question that we must resolve is whether, on the facts as presented, a jury could reasonably find that the broker-agent breached its fiduciary obligations to act with the utmost good faith toward its principal. A jury might well reach the same conclusion on this issue as did the trial court, but our review of the record convinces us that a jury could reasonably view these facts as constituting a breach of plaintiff's duty to its client. *Godefroy v. Reilly*, 134 Wash. 163, 165, 235 Pac. 8 (1925). We must conclude, therefore, that the trial judge erred in dismissing defendant O'Grady's counterclaim as a matter of law, and in entering judgment for the plaintiff Valley Land. In view of our determination that this case must be remanded for a new trial, we will, pursuant to ROA 16, discuss other assignments of error on issues which may arise again at a retrial of this case.

During the course of trial, the trial judge refused to allow defendant O'Grady to introduce into evidence, by means of testimony of an expert witness, the "Manual for Real Estate Brokers and Salesmen" published by the Director of Licenses pursuant to RCW 18.85.130. The evidence related to the defendant's claim that plaintiff was negligent in not presenting defendant with information as to the reasonable value of his property. At trial, as well as on appeal, defendant argued that the manual, being provided

for by the legislature, was the law of the state and that the standards of conduct established by the manual were "as binding as though enacted by the legislative body itself." But even if defendant's contention is correct, his attempt to prove what this law is by means of a broker's testimony was improper. This was within the province of the trial judge and not an expert witness. *Seattle v. Erickson,* 99 Wash. 543, 169 Pac. 985 (1918); 7 Wigmore, Evidence § 1952 (3d ed. 1940). We do not agree, however, that the contents of this manual carry the force of law as the statute authorizing the manual (RCW 18.85.130) merely directs the issuance of a manual containing general information covering matters on which applicants will be examined and is obviously not intended to be a formal rule as contemplated by RCW 34.04. This court, in *Hartman v. Port of Seattle,* 63 Wn.2d 879, 389 P.2d 669 (1964), held that evidence of governmental codes or standards of safety, issued as advisory material not having the force of law, is not admissible on the issue of negligence. The two Washington cases relied upon by defendant, *Home Owners' Loan Corp. v. Rawson,* 196 Wash. 548, 83 P.2d 765 (1938), and *State v. Miles,* 5 Wn.2d 322, 105 P.2d 51 (1940), involved the power of an administrative agency to adopt rules and regulations within the scope of legislative authority, which is not the issue now before us.

■ The trial court also refused to allow defendant O'Grady to introduce evidence that the reasonable market value of the land was above the price provided for in the option. Defendant O'Grady sought to prove the reasonable market value of the land by the use of comparable sales, a procedure long recognized in the state. See *Seattle & Montana Ry. v. Gilchrist,* 4 Wash. 509, 30 Pac. 738 (1892). We find that the question of reasonable market value of the property is quite relevant to the question whether or not the broker acted with the utmost fidelity toward his principal.[1]

---

[1] See Annot. 32 A.L.R.2d 728 (1953) for discussion apropos of this point.

The same reasoning applies to the refusal of the trial court to permit defendant to show that the option allowed the buyer to strip the land of its most valuable acreage. This also is a factor which relates to the question of whether or not the broker breached his fiduciary obligations to his principal and to the extent of the damages if such breach is established.

During the course of the trial, Mr. O'Grady called Mr. Fiori as an adverse witness. He questioned Mr. Fiori as to who proposed the "deed release provision" in the option agreement. In the prior suit between Mr. O'Grady and Mr. Fiori, Mr. Fiori had testified during pretrial deposition that this "deed release provision" was put in the contract at the insistence of Mr. Lane, the broker. During his examination at trial in this action, Mr. Fiori, again under oath, testified that the "deed release provision" was in the contract at his own insistence. At this point, Mr. O'Grady's counsel attempted to impeach the testimony of Mr. Fiori by asking to introduce the prior inconsistent statement. The trial court refused to allow this impeachment on the ground that there was no showing of surprise on the part of defendant. We fail to see how counsel could better show surprise. Mr. Fiori was asked the same question twice under oath. His answer in the first trial was exactly the opposite of what it was at the present trial. In both instances, the answer given was most damaging to Mr. O'Grady. Although the question of whether or not a witness is adverse is normally left to the sound discretion of the trial judge, we feel that under the circumstances here and particularly since the witness was an officer of the court, the trial judge abused his discretion in not allowing Mr. O'Grady's counsel to introduce the prior inconsistent statement sworn to in the pretrial deposition of the former trial.

The trial court concluded as a matter of law that plaintiff was entitled to judgment in the sum of $15,000 against defendant, plus interest from September 5, 1963, the date defendant's performance was due under the commission agreement on which this suit was based. This court

stated in *Mall Tool Co. v. Far West Equip. Co.*, 45 Wn.2d 158, 176, 273 P.2d 652 (1954), on which plaintiff relies in support of the trial court's allowance of interest, that interest from the date performance was due is allowable (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for "*[A]n amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance upon opinion or discretion.*" We also cited with approval McCormick on Damages § 54, which defines a liquidated claim as one where "[T]he evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, *without reliance upon opinion or discretion.*" (Italics ours.)

The trial court's $15,000 judgment, equally 10 per cent of the sale price, was determined by considering parol evidence at the time of trial and not by a "fixed standard contained in the contract." At the time defendant's performance was due (the date Notice of Intention to Exercise Option was delivered to defendant), the amount of the commission could only be determined by reference to plaintiff's estimates and opinion as to the amount of closing costs; the commission could have equaled, been greater than or less than $15,000. Although Mr. Lane testified that he orally agreed with defendant to return a portion of the $22,000 if a survey was not required, under the terms of the commission agreement he was not legally bound to do so. Thus, under the terms of the commission agreement, plaintiff's claim at the time performance was due was neither liquidated nor determinable by computation with reference to a fixed standard contained in the contract, without reliance upon opinion or discretion. The trial court's allowance of interest prior to the date of the judgment was improper.

## CROSS-APPEAL

Plaintiff cross-appeals alleging as error the trial court's dismissal of its claim against defendants McDonald, Augus-

tavo, and Fisher Realty, in which claim plaintiff alleges that said defendants wrongfully interfered with the commission contract whereby defendant O'Grady was to pay realtor's commission to plaintiff and that said defendants had induced Mr. O'Grady to breach his commission contract with plaintiff.

The May 3, 1963, "Authority to Sell Real Estate" provided that the commission on any such sale was to be 10 per cent of the sale price and the contract was an exclusive right for a term of 90 days. Under the terms of the August 1st commission agreement, Mr. O'Grady agreed to pay a commission of $22,000 to Valley Land, but as discussed above, such commission agreement included items other than the realtor's commission.

On August 17, 1963, Mr. O'Grady, through his attorney, addressed a letter to Mr. Fiori as follows:

Re: O'Grady vs. Fiori

Option Agreement and Commission Agreement

Dear Mr. Fiori:

Please be advised that we have been retained to represent Mr. William O'Grady in regard to a certain option agreement which was apparently signed by the parties on August 1, 1963.

The purpose of this letter is to advise you and Valley Land Co. that Mr. O'Grady hereby rescinds the alleged option agreement.

We shall further instruct Valley Land Co. to return any earnest money heretofore deposited with Valley Land Co. as we believe the entire basis of this transaction was improper.

It is to be noted that Mr. O'Grady, by the terms of the aforesaid letter, attempted to rescind the Fiori option, but did not rescind plaintiff's listing agreement. In the separate action by Fiori against O'Grady, judgment was entered giving O'Grady the option of performing the Fiori contract or paying Fiori $25,000 in damages. Mr. O'Grady elected the latter as is set forth above. Therefore, the attempted rescission by Mr. O'Grady was ineffective and the trial court

properly held that the commission agreement remained in full force and effect.

■ Essential elements to plaintiff's claim against Fisher Realty, et al., are (1) that the interferor, with knowledge of the existence of a valid contract (2) intentionally interferes therewith (3) inducing or causing a breach of such contract (4) which results in damages to the party whose contract rights have been disrupted. *Calbom v. Knudtzon*, 65 Wn.2d 157, 162, 396 P.2d 148 (1964). The only evidence in the record touching on the element of inducement is the testimony of Mr. O'Grady when called by the plaintiff and this testimony shows that Mr. O'Grady had already determined in his own mind that he had a bad deal and was going to see a lawyer before Fisher Realty's men first discussed the Fiori option with him. To find that these defendants induced or purposely caused a breach of contract by Mr. O'Grady, we must find that they were a moving cause of his action in attempting to rescind the sale contract. We cannot so find, and agree with the trial court's analysis of the evidence in this cross-appeal and affirm the dismissal of these defendants.

*Dryden v. Vincent D. Miller, Inc.*, 56 Wn.2d 657, 662, 354 P.2d 900 (1960), relied on by plaintiff is not in point because in *Dryden* the facts which the broker should have communicated to his principal came to the knowledge of the broker *after* the principal had accepted the contract and the broker had not withheld any information available to him at the time he had fully earned his commission by providing a purchaser acceptable to the seller.

The judgment of the trial court is reversed on plaintiff's judgment against defendant O'Grady and on the dismissal of defendant O'Grady's counterclaim. The case is remanded for new trial on these issues. Costs will abide the result of a new trial.

FINLEY, C. J., DONWORTH and HUNTER, JJ., and LANGENBACH, J. Pro Tem., concur.