## George F. Tyler *et al.*

*v.*

## A. D. Sanborn *et al.*

*Filed at Springfield April 5, 1889.*

1. Agency—*agent dealing in the subject matter of his agency.* An agent appointed to sell property can not, either directly or indirectly, have an interest in the sale of the property of his principal which is within the scope of his agency, without the consent of his principal freely given, after full knowledge of every matter known to the agent which might affect the interests of the principal.

2. It is of no consequence in such a case that no fraud was actually intended, or that no advantage was, in fact, derived from the transaction, by the agent. The rule is not merely remedial of wrong actually committed, but is intended to be preventive of wrong.

3. An agent may undoubtedly buy of his principal and have an interest in the sale of property belonging to his principal, but in such case the burden is upon the agent to show that the principal had knowledge, not only of the fact that the agent was buying or interested, but also of every material fact known to the agent which might affect the principal, and that having such knowledge, he freely consented to the transaction. This rule is equally applicable to cases where the agent is empowered to sell at a stated price, as when his authority is to sell generally.

4. An agent was appointed by non-resident owners of real estate to look after the same and collect rents, and procure offers of purchase, to be submitted to his principals. He reported an offer of $1000 by B. for the property. The offer was accepted and a deed sent to the agent for delivery on payment of that sum. B. declined finally to make the purchase, when the wife of the agent agreed to take the property at the price named, and B. made her a deed, and she paid the price to her husband, and the two deeds were recorded, placing the legal title in the wife. This was done without the knowledge of the principals, and no fraud in fact was intended: *Held,* that the transaction amounted to a sale by the agent to his wife, and was fraudulent in law, and that the principals, upon learning the facts, had the right to have the sale and the deeds set aside.

5. Where the owners of real property sent to their agent a deed, to be delivered, on payment of $1000, to one who had made an offer to purchase at that price, it was *held,* that the agent had no authority to use the grantee in such deed as a mere trustee to convey the title to

the agent, or to some one else, so that the agent might have an interest in the property. The law will not allow an agent to occupy a position in which he may be tempted to betray his trust.

6. ALLEGATIONS AND PROOFS—*in chancery—proof of any one of several grounds of relief sufficient.* If, from the allegations in a bill to set aside a sale made by an agent, and the facts proved, the transaction is deemed fraudulent in law, it is immaterial whether the allegations of fraud in fact are proved or not. If any alleged ground of relief is shown by the evidence, it will be error to dismiss the bill.

7. HUSBAND AND WIFE—*of their status under existing legislation—in respect to property rights.* Although the statute has so far changed the common law that a wife can now contract with her husband, and has abolished his estate in her lands during coverture, it has not denied to either all interest in the property of the other. The husband is still the head of the family, and the expenses of the family and of the education of the children are chargable upon the property of both, or either of them, in favor of creditors. The husband still has an interest in his wife's real estate.

APPEAL from the Circuit Court of McLean county; the Hon. OWEN T. REEVES, Judge, presiding.

Messrs. KERRICK, LUCAS & SPENCER, for the appellants:

An agent for the owner of real estate has no right to speculate on property committed to his care, nor has he any right to put himself in a position adverse to the interest of his principal. *Hughes* v. *Washington,* 72 Ill. 85; *Zeigler* v. *Hughes,* 55 id. 288; *Cottom* v. *Holliday,* 59 id. 179; *Coat* v. *Coat,* 63 id. 74.

Two deeds or contracts executed at the same time constitute but one transaction. *Kruse* v. *Steffens,* 47 Ill. 115.

The law will not permit an agent to buy at his own sale. (*Coat* v. *Coat,* 63 Ill. 74; *Ebelmesser* v. *Ebelmesser,* 99 id. 548.) And that is the law, even if the sale is to be at a fixed price. *Ruckman* v. *Bergholtz,* 37 N. J. L. 437; *Porter* v. *Woodruff,* 36 N. J. Eq. 174.

Mr. Isaac N. Phillips, and Mr. James S. Ewing, for the appellees:

The sale to Beard was not colorable, and his name was not used for the purpose of deceiving appellants, and there was no actual fraud perpetrated or attempted.

But even if Sanborn, as agent, failed in his duty to his principals, and had reported ever so falsely as to the value of the property, that could not affect the purchaser having no knowledge of the agent's bad faith.

The purchase by the agent's wife is not a purchase by him. A wife may contract even with her husband. *Thomas* v. *Mueller*, 106 Ill. 36.

Mr. Justice Scholfield delivered the opinion of the Court:

George F. Tyler and Edwin S. Tyler, as executors of the last will and testament of Frederick Tyler, deceased, were the owners of certain lots in the village of Chenoa, in McLean county. George F. Tyler resided in Philadelphia, Pennsylvania, and Edwin S. Tyler resided in Hartford, Connecticut. They employed O. D. Sanborn, who resided in Chenoa, to take charge of the property, rent it, and procure a purchaser for it. He was to obtain offers to purchase, and report to them, leaving them to accept or decline the offers, as their judgments should direct. After some futile efforts in this way, Royal E. Beard proposed to pay $1000 for the property, and take it as it was, they removing the incumbrance occasioned by a tax sale made before that time, then supposed to be upon it. Sanborn reported this offer to the Tylers, and they accepted it, and forwarded to Sanborn a deed of the property. When Sanborn received the deed, he notified Beard of the fact, and that he was ready to deliver it. What then took place is thus narrated by the several witnesses:

Sanborn says: "I notified Mr. Beard that the deed was ready for him, and he said he was sorry,—that he hoped they

would not accept it. I said I hated to have him back out on the property, and would like to complete the trade as we had started, and I did not want to return any more papers; that they had found fault with the others, and they would begin to think that it was all boy's play out here, and too much of that returning papers, and he finally said he would let me know that evening whether he would take it or not. That evening he came in and said he did not want the property, and did not want to take it. I had no written contract with him, and he had paid nothing, and I still had possession of the deed when he told me he did not want the property. When I was at home that evening, I was telling my wife that I was afraid I was going to have trouble to sell that property; that Beard had come in, and did not want it, and I was feeling that my labors had all been in vain, and she spoke up and said, if Beard wanted to sell it for what he gave for it, she would buy and take it off his hands. He said he would let her have it at what he gave for it if she would take it. Mr. Beard, the next day, I think, brought his wife in, and they executed a deed to my wife, and my wife paid the money. Beard never paid me any money. He never furnished any of the money. I presume I had a talk with my wife about it before that evening. She knew the price I was selling to Fales for, and knew that I was acting for eastern parties. I told her I thought she did not want to buy the property. I did not tell her what I thought it was worth. I was just eating supper, and told her he was going to back out, and she said she would take it at that price, and I opposed buying it, and she insisted on buying. I never reported any of these facts to the Tylers. Before this time I had never expressed any opinion to my wife as to what I thought the property was worth. I had been married about three years, and was post-master. My wife was in no business, but had some means. It was invested in notes and certificates of deposit. I looked after making investments and buying notes for her, after consulting with her. No one else

did any business for her." On cross-examination he said, among other things: "At the time of the purchase of this property my wife had about $3500, but I had no means." And again, speaking of Beard's refusal to take the property, he repeated: "I then went home, and had this talk with Mrs. Sanborn—told her I thought the sale would go up, and she said she would take the property. She was able to do so, and bought it against my objection. Up to that time she had been loaning her money. Beard came in again that evening, and I told him what my wife had said about it, and he said he would make a deed to her, and he did so the next day. I took the deeds to Bloomington, here, and had them recorded, as an accommodation to my wife and Mr. Beard. She paid the money and I sent it to Mr. Tyler. I have no interest, either absolute or conditional, in any shape or form, in the property, except my dower."

Frances C. Sanborn said: "When he (her husband, O. D. Sanborn,) reported to me that Beard probably would not take the property, I said, 'I will take it,—that is, if Mr. Beard will sell it to me for the same price he was to give the Tylers.' He said I did not want it, and I said I wanted to put my money into something solid, and he further objected, and told me of the cracks in the walls, and the disrepute it was in, and I still said I thought it was very cheap, and that I wanted to take it. It was an impulsive conversation on my part. I never had thought of it before. I told him to tell Mr. Beard I would take it. I don't remember when the next conversation was. It was some time before I paid for it. I paid Mr. Sanborn. I remember making up the money to pay him, but don't remember what the amounts were made up from. That was when Mr. Sanborn had completed his arrangements, so he could send the purchase money. It was not the same day I had the other talk. I should think it was some weeks. The deed was made and delivered to Beard, and from Beard to me, without any money having been paid to anybody. I

don't know how the money was sent to Mr. Tyler, nor where it was gotten to send to him. The same evening Mr. Sanborn told me about the property,—that Beard would not take it,— he told me I could have it. At that time Mr. Sanborn had charge of my business affairs, but I advised with no one about buying this property." On cross-examination, she again said: "He (Sanborn) said Mr. Beard would sell it to me just as he had bought it, if I would take it off his hands. We then talked it over, and I made up my mind that I still wanted it, and he said to me that if I was bound to have it, he would tell Mr. Beard to-morrow, and have the deeds made. There was no agreement or understanding between Mr. Beard and myself that it was a purchase for me, or that he was to have any interest in it. Prior to the time I have spoken of, there was no understanding that the property should be sold to Beard, and by Beard to me."

Beard said, after speaking of his offer to buy, his ability to pay, etc.: "I offered him $1000 cash. Several weeks after, he came to me and informed me that my offer had been accepted. I told him, that upon considering the matter I had decided not to take the property. He urged me to take it, and I told him I would consider the matter, and call at his post-office that evening. I called on him that evening, and told him I had decided not to take it, and he told me his wife, Frances C. Sanborn, would take the property if I would deed it to her without expense to her, and I did so. I never paid anything for those lots, and never received any money or anything for them."

Evidence was introduced tending to show that the lots were, at the time these deeds were made, worth much more than $1000, and there was, on the other hand, other evidence introduced tending to rebut that. Perhaps a fair deduction from the evidence is, that the lots were generally estimated as worth more than $1000, but that all real estate, and especially in Chenoa, was, at that time, difficult to sell, and that it

is not clear that any person was then ready to pay, in cash, more than $1000 for these lots; but in the view that we shall take of the case, it may be admitted that there was not such inadequacy between the price paid and the actual value of the lots, as, of itself, to raise a presumption of a fraudulent intent.

The bill asks to have the deeds set aside as fraudulent as against the rights of the Tylers. The decree dismissed the bill at the complainants' costs. If, from the allegations in the bill and the facts proved, the transaction is one deemed fraudulent in law, it can, of course, be of no consequence that the allegations of fraud in fact are not proved. If any alleged ground of relief is proved by the evidence, the decree below is erroneous, and must be reversed.

The evidence quoted *supra* can leave no doubt on the mind as to the real character of the transaction. It was, in effect, a sale and conveyance to Frances C. Sanborn, by her husband, O. D. Sanborn, as the agent of the Tylers, without their knowledge. The sale to Beard was not consummated. He refused to take the property, but became an agent, in fact, for Frances C. Sanborn, whereby she was enabled to obtain the legal title. In equity, the execution of the deed by Beard to her, and the delivery thereafter of both deeds to her, was but the execution and delivery of a deed to her by the Tylers, without their knowledge.

Admitting that the price paid for the property was not grossly inadequate, and that it was one with which, if it had, in good faith, come from Beard, the Tylers would have been satisfied, the question is still left whether the fact that the purchase was made by the wife of their agent, without their knowledge, of itself, alone, renders the deeds voidable, at their election.

The doctrine is familiar, and has been often recognized by this court, that an agent can not, either directly or indirectly, have an interest in the sale of the property of his principal which is within the scope of his agency, without the consent

of his principal, freely given, after full knowledge of every matter known to the agent which might affect the principal. (*Coat* v. *Coat*, 63 Ill. 74; *Ebelmesser* v. *Ebelmesser*, 99 id. 548; *Zeigler* v. *Hughes*, 55 id. 288; *Hughes* v. *Washington*, 72 id. 85.) It is of no consequence, in such case, that no fraud was actually intended, or that no advantage was, in fact, derived from the transaction by the agent. Kerr on Fraud and Mistake, (Bump's ed.) 173, 174; Perry on Trusts, sec. 206; Story's Eq. sec. 315; Bispham's Eq. (2d ed.) p. 299, sec. 238. The rule is not merely remedial of wrong actually committed,—it is intended to be preventive of wrong. Public policy requires, as was tersely and forcibly said by the Chief Justice in *Staats* v. *Bergen*, 2 C. E. Green, 554, that "a trustee may not put himself in a position, in which, to be honest, must be a strain on him." An agent may undoubtedly buy of his principal, or have an interest in the sale of property belonging to his principal; but in such case the burden is upon the agent to show that the principal had knowledge, not only of the fact that the agent was buying or interested, but also of every material fact known to the agent which might affect the principal, and that, having such knowledge, he freely consented to the transaction. *Porter* v. *Woodruff*, 36 N. J. Eq. 174; *Dunne* v. *English*, (L. R. 18 Eq. Cases, 524,) 10 Eng. Rep. (Moake's notes,) 837. See, also, notes to *Fox* v. *Mackreth*, *Pitt* v. *Mackreth*, 1 L. C. in Eq. (Hare & Wall. notes,) 3d Am. ed. pp. 209, 210, *et seq.*; id. p. 220. The rule is equally applicable to cases where the agent is empowered to sell, as in the present case, at a stated price, as where his authority is to sell, generally. 1 Am. & Eng. Encyclopedia of Law, p. 376, and cases cited; *Porter* v. *Woodruff*, 36 N. J. Eq. 174; *Ruckman* v. *Bergholtz*, 37 N. J. L. 437; *Peckham Iron Co.* v. *Harper*, 41 Ohio St. 108.

It is plain, then, that under the authority to deliver the deed to Beard for the $1000, no authority was conferred to use Beard as a mere agent or trustee to convey the title to Sanborn or to some one else, so that he would have an interest in it,

merely because the Tylers would thereby receive the same money they would have received had the deed been delivered to Beard. The Tylers are allowed to treat the conveyance as void, at their election, not because they have been injured, but because the law will not allow their agent, Sanborn, to occupy a position in which he might be tempted to betray his trust. (See cases cited *supra*, and notes to *Fox* v. *Mackreth* and *Pitt* v. *Mackreth, supra,* at p. 211.) When Beard declined to take the property, the Tylers were entitled to know that Sanborn had concluded to let his wife take it, unless, indeed, it can be held that the conveyance to her was as much a matter of indifference to him, in a legal sense, as if it had been to a stranger,—and that is, in effect, the contention of counsel for appellees.

Such a sale, at common law, would clearly have been voidable, both because the wife, there, had no independent power to contract, and because the husband would have taken an estate during coverture in the property. See 1 Blackstone's Com. (Sharswood's ed.) p. 441, *442; Reeve's Domestic Relations, (2d ed.) 98, *99; and also id. 28. Notwithstanding that our statute has so far changed the common law that the wife can now contract with the husband, and has abolished his estate during coverture, it has not denied to each all interest in the property of the other. The husband is still the head of the family, and the expenses of the family and of the education of the children are, by section 15 of the statute in relation to "Husband and wife," charged upon the property of both husband and wife, or of either of them, in favor of creditors. (Rev. Stat. 1874, p. 577.) Upon the death of the wife, intestate, without children surviving, the husband inherits one-half of her real estate. (Rev. Stat. 1874. p. 39, sec. 1.) And, in any event, upon her death he is entitled to dower in her real estate. Hence the husband still has a pecuniary interest, greater or less, as circumstances may vary, in all the real estate of which his wife may be owner during coverture. There

is, moreover, apart from this pecuniary interest, an intimacy of relation and affection between husband and wife, and of mutual influence of the one upon the other for their common welfare and happiness, that is absolutely inconsistent with the idea that the husband can occupy a disinterested position, as between his wife and a stranger, in a business transaction. He may, by reason of his great integrity, be just in such a transaction; but unless his marital relations be perverted, he can not feel disinterested,—and it is precisely because of this feeling of interest that the law forbids that he shall act for himself in a transaction with his principal. It is believed to be within general observation and experience, that he who will violate a trust for his own pecuniary profit, will not hesitate to do it, under like circumstances, for the pecuniary profit of his wife.

In our opinion, the policy of the law equally prohibits the wife of the agent, as it does the agent himself, from taking title to the property which is the subject of his agency, without the knowledge and express consent of the principal. The wife is here shown to have known the relation of her husband to the Tylers in respect to this property, and all the facts in regard to the transaction with Beard. She is therefore charged with knowing that she could not become the purchaser without letting the Tylers know it, and the burden is on her to show that they did know it.

The Tylers are, in our opinion, entitled to have these conveyances cancelled, upon returning to Frances C. Sanborn what they have received, with accruing interest; and as against this, they are entitled to a deduction of the reasonable value of the rents and profits, above and beyond the amount paid for taxes and necessary repairs.

The decree below is reversed, and the cause remanded to the circuit court, with directions to there enter a decree in conformity with this opinion.

*Decree reversed.*

146        Tyler *et al. v.* Sanborn *et al.*

Mr. Justice Bailey, dissenting:

I am unable to concur with the majority of the court in this case. The evidence shows, and that too without any controversy, that Mrs. Sanborn, learning from her husband that Beard had declined to take the property in question at the price previously agreed upon by him, and at the price which the owners had agreed to and were willing to take, offered to become the purchaser; that such offer was made by her wholly upon her own motion, and not at the suggestion but against the advice and remonstrance of her husband; that she did thereupon become the purchaser of the property, and paid for it out of her own separate estate, and that in the whole transaction, the business was conducted, so far as she was concerned, by herself, her husband in no way assuming to act or in fact acting as her agent.

It is assumed in the opinion of the majority of the court and I think correctly, that no fraud in fact is shown, the decision being based wholly upon the assumption that there was such fraud in law as must necessarily invalidate the transaction. I make no question as to the soundness of the doctrine that an agent employed by another to sell his property can not, either directly or indirectly, become the purchaser, and that if he does so, his principal may interpose and avoid the sale. But that is not this case. The purchaser here was not the agent, but another person who was *sui juris*, and capable of acquiring, owning and controlling her separate property wholly independent of any control or interference on the part of her husband.

The opinion treats the purchase by the wife as being the same in legal effect as though made by the husband. This doubtless would be the case if the wife were still laboring under the disabilities imposed by the rules of the common law. But our statute has so far emancipated her from those disabilities as to place her in all essential respects, in the same legal position, so far as property rights are concerned, as though she

were a *feme sole.* Her separate estate is no longer subject to either the rights or the control which, at common law, resulted to the husband from the marital relation. She now has the same control over her estate that the husband has over his. She has the same legal power to acquire property, to buy and sell, or engage in business, she would have if she were unmarried. In respect to property rights and business transactions she is, in contemplation of law, a stranger to her husband, and may act independently of him, or assume a position adverse to his. I can not therefore yield assent to the proposition that, as the law now stands, the wife of an agent must, as a matter of law, be held to be subject to the same legal incapacity to become the purchaser of the property which is the subject matter of the agency as is the agent himself. Whether a purchase by her is to be treated as fraudulent, and therefore voidable at the instance of the vendor, must, in my opinion, depend upon the circumstances, and such purchase therefore presents a question of fraud in fact and not of fraud in law.

I do not question that the relation between the agent and purchaser, whether as husband and wife or otherwise, is a circumstance to be considered in connection with other evidence, whenever fraud in fact is charged. Slighter evidence will be required to raise an inference of fraud where the agent and purchaser sustain to each other some near relation, such as parent and child, brother and brother, or husband and wife, but such inference can not arise from the mere relation alone. In all such cases fraud in fact must be charged and proved, and the relation between the parties can be considered only as bearing upon the measure of proof required to sustain the charge.

As no fraud in fact is proved in this case, I am of the opinion that the decree of the Circuit Court should be affirmed.

Mr. CHIEF JUSTICE CRAIG: I concur in the views expressed by Mr. Justice BAILEY.