[No. 39270.  Department Two.  February 29, 1968.]

ROY M. MERSKY *et al., Appellants,* v. MULTIPLE LISTING BUREAU OF OLYMPIA, INC., *et al., Respondents.**

*Reported in 437 P.2d 897.

*Seeber & Shannon,* for appellants.

*Lynch & Lynch,* for respondents.

HAMILTON, J.—In this action appellants (plaintiffs), alleging the breach of an agent's duty of loyalty and full disclosure, seek recovery of a real-estate commission paid to respondents (defendants) who, as real-estate agents, handled the sale of appellants' home. Following trial, the superior court dismissed the claim upon the grounds that the alleged breach was immaterial. This appeal followed.

We reverse the action of the trial court.

The salient facts are these: Appellants, by virtue of a change of employment, moved from Olympia, Washington, to the state of Colorado in June, 1963. As a result, they

wished to sell their beach-front home in Olympia, which they had purchased in late 1961 for $32,500 and to which they had added a number of valuable improvements. Accordingly, on June 7, 1963, they listed their residence property with respondent Olympia Real Estate, Inc., for a sales price of $39,750. The sales agency agreement was on a standard form of the exclusive-multiple listing type, and was filled out and executed on behalf of the respondent realty firm by respondent Mrs. Alyce E. Thompson, a saleslady employed by the firm. It is undisputed that appellants selected the respondent firm because they were acquainted with and held the then president-broker of that firm, Mr. Charles E. Anderson, in high esteem.

The house was shown to several prospects and produced one firm offer on July 10, 1963, of $32,500 which appellants rejected. Thereafter, in September, 1963, and during the continuance of the sales agency agreement, Mrs. Thompson showed the property to her sister and brother-in-law, who lived in California, but were frequent visitors to Olympia, were known to the members of the realty firm, and were contemplating a possible transfer to the Northwest. On September 22, 1963, by way of an earnest-money receipt and agreement prepared by Mrs. Thompson, Mrs. Thompson's sister and brother-in-law made an offer of $33,000 for the property. This offer was transmitted to appellants in Colorado with a letter, dated September 27, 1963, from Mr. Anderson listing several advantages he felt pertained to the offer and urging appellants to give it their most serious consideration.

Appellants replied on the evening of September 30, 1963, by a long-distance telephone call to Mr. Anderson at his home. During the course of this call they expressed their disappointment with the amount of the offer, stated acceptance would mean a financial loss to them, discussed the advisability of a counteroffer as opposed to acceptance, and asked who the prospective purchasers were. Mr. Anderson, in essence, responded that, although final acceptance was up to them, winter was approaching with its lowered market for beach-front property, that they would be wise to

take their financial loss and get it over with, and that he did not know who the purchasers were except that they were from California. Mr. Anderson candidly attributed his failure to reveal the identity of the purchasers to forgetfulness on his part.

On October 1, 1963, appellants forwarded their acceptance of the offer to respondents with a letter in which they expressed their reliance upon Mr. Anderson to further their best interests, and again reiterated their reluctance concerning the proposed sale. Upon receipt of the letter the transaction was closed by respondents. The purchasers at some later date, after making additional valuable improvements, sold the property for $46,000. This subsequent sale was also handled by Mrs. Thompson.

In mid-December, 1963, appellants for the first time discovered that the purchasers were related to Mrs. Thompson. They, thereafter, initiated this suit. At trial they testified unequivocally, through appellant husband, that they would not have accepted the offer, but would have made a counteroffer, had Mr. Anderson told them of the prospective purchasers' relationship to Mrs. Thompson.

The question thus posed on this appeal is whether, standing alone, the failure of respondents to make a full and timely disclosure of the ties of kinship between the potential purchaser and Mrs. Thompson constituted such a breach of duty as would warrant a refund of the real-estate commission respondents realized from the sale.

In answering the question in the affirmative, we start from the general and basic premise that a real-estate brokerage firm with whom property is appropriately listed for sale becomes the agent of the seller for the purpose of finding a purchaser. And, from this agency relationship springs the duty and the obligation upon the part of the listing broker, as well as on the part of his subagents, to exercise the utmost good faith and fidelity toward his principal, the seller, in all matters falling within the scope of his employment. *Valley Land Office, Inc. v. O'Grady,* 72 Wn.2d 247, 432 P.2d 850 (1967); *Frisell v. Newman,* 71 Wn.2d 520, 429 P.2d 864 (1967); *Farrell v. Score,* 67 Wn.2d

957, 411 P.2d 146 (1966); *Henderson v. Johnson,* 66 Wn.2d 511, 403 P.2d 669 (1965); *Karle v. Seder,* 35 Wn.2d 542, 214 P.2d 684 (1950); *Westerbeck v. Cannon,* 5 Wn.2d 106, 104 P.2d 918 (1940); *Ewing & Clark, Inc. v. Mumford,* 157 Wash. 617, 289 Pac. 1026 (1930); *Easterly v. Mills,* 54 Wash. 356, 103 Pac. 475 (1909); *Cantwell v. Nunn,* 45 Wash. 536, 88 Pac. 1023 (1907); 12 Am. Jur. 2d *Brokers* §§ 83, 84 (1964); 12 C.J.S. *Brokers* § 41 (1938).

■ Furthermore, there flows from this agency relationship and its accompanying obligation of utmost fidelity and good faith, the legal, ethical, and moral responsibility on the part of the listing broker, as well as his subagents, to exercise reasonable care, skill, and judgment in securing for the principal the best bargain possible; to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, or otherwise self-dealing with that property, without the explicit and fully informed consent of the principal; and to make, in all instances, a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, material in connection with the matter for which the broker is employed, and which might affect the principal's rights and interests or influence his actions. *Frisell v. Newman, supra; Moon v. Phipps,* 67 Wn.2d 948, 411 P.2d 157 (1966); *Breedlove v. Holton,* 143 Wash. 347, 255 Pac. 132 (1927); *Hay v. Long,* 78 Wash. 616, 139 Pac. 761 (1914); Restatement (Second) *Agency* §§ 381, 389, 391, 394, 406 (1958); 12 Am. Jur. 2d *Brokers* §§ 84, 87, 89 (1964); 12 C.J.S. *Brokers* § 41 (1938).

■ Against the backdrop of these general principles, we are satisfied that, as a matter of almost universal application, the duties of undivided loyalty, good faith and full disclosure, running from the broker and his subagents to the principal, embraces the obligation to timely reveal to the principal any close ties of kinship which may exist between the broker, or a participating subagent, and a prospective and proffered buyer or seller as the case might be. *See,* Annot., 26 A.L.R.2d, Duty of real-estate broker to

disclose that prospective purchaser is a relative, 1307 (1952).

This duty imposed upon a broker to make such a disclosure has been recognized and applied in cases involving purchasers who were the broker's mother, mother-in-law, wife, sister, and daughter. *Anderson v. Thacher,* 76 Cal. App. 2d 50, 172 P.2d 533 (1946) (mother-in-law); *Estate of DeHart,* 196 Cal. App. 2d 452, 16 Cal. Rptr. 603 (1961) (mother); *Curotto v. Hammack,* 362 Mo. 457, 241 S.W.2d 897, 26 A.L.R.2d 1302 (1951) (mother-in-law); *Herzog v. Cooke,* 99 Conn. 366, 121 Atl. 868 (1923) (sister); *Perry v. Engel,* 296 Ill. 549, 130 N.E. 340 (1921) (daughter); *Tyler v. Sanborn,* 128 Ill. 136, 21 N.E. 193, 4 L.R.A. 218 (1889) (wife); *McNutt v. Dix,* 83 Mich. 328, 47 N.W. 212, 10 L.R.A. 660 (1890) (wife); *McNeill v. Dobson-Bainbridge Realty Co.,* 184 Tenn. 99, 195 S.W.2d 626 (1946) (mother); *Hay v. Long,* 78 Wash. 616, 139 Pac. 761 (1914) (wife).

■ The obligation thus imposed upon the broker, and a participating subagent, springs from and is predicated upon the same policy considerations which give rise to the rule prohibiting self-dealing by an agent, namely, to assure the principal that he may have and rely upon the impartial and unreserved fidelity of his agent throughout the course of the transaction for which the agent was employed. In this respect, it is both apparent and recognized that the temptation and the opportunity to compromise or temper the agent's obligation to obtain the best and most advantageous bargain for his principal is inescapably and incalculably present, and may be too easily and subtly seized upon, when an agent or his subagent is confronted, in a transaction involving the principal's property, with the competing interests of a near relative and the influence of a natural desire to favor one's own. If for no other reason, sheer simplicity of disclosing the intervening kinship interest to the principal renders the inherent risk (that the agent's objectivity may be distorted) an unwarranted and unnecessary one for the principal to assume. The rule requiring full and timely disclosure of such a kinship is, therefore,

not only desirable from the principal's standpoint, but is designed to remove and prevent any undue strain upon the agent's obligation to be forthright and straightforward in the handling of his principal's business.

Consistent with the policy of preventing a broker or his subagents—without the informed consent of the principal—from intentionally or carelessly entangling the affairs of the principal with ties of the agent's kin, is the corollary rule that such dealings by a broker, or his subagents, without the required disclosure, amount to fraud in law. This, in turn, entitles the principal, upon discovery of the undisclosed relationship, to rescind the transaction, recover any profit gained by the broker from the transaction, or recoup the commission paid to the broker by virtue of the transaction. *Curotto v. Hammack,* 362 Mo. 457, 241 S.W.2d 897 (1951); 26 A.L.R.2d 1307 (1952). It is of no consequence, in this regard, that the broker may be able to show that the breach of his duty of full disclosure and undivided loyalty did not involve intentional or deliberate fraud, or did not result in injury to the principal, or did not materially affect the principal's ultimate decision in the transaction. The rule and the available remedies, instead, are designed as much to prevent fraud as to redress it, and follow directly upon the heels of the broker's deliberate or innocent failure to timely and fully disclose to his principal the fact of the interdicted relationship, for the reason that the very existence of the relationship may have corroded the broker's obligation of undivided loyalty, may have been a material circumstance to the principal, or may have affected his actions or decisions in the course of the transaction involved. A classic expression of this principle was set forth in 1926 by Justice Cardozo in the case of *Wendt v. Fischer,* 243 N.Y. 439, 154 N.E. 303 (1926), where, in dealing with a similar situation, he wrote, at 443:

> Finally we are told that the brokers acted in good faith, that the terms procured were the best obtainable at the moment, and that the wrong, if any, was unaccompanied by damage. This is no sufficient answer by a trustee forgetful of his duty. The law "does not stop to inquire

whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case" (*Munson v. Syracuse, etc., R. R. Co., supra,* at p. 74 [103 N. Y. 58, 8 N.E. 855]; cf. *Dutton v. Willner,* 52 N. Y. 312, 319). Only by this uncompromising rigidity has the rule of undivided loyalty been maintained against disintegrating erosion.

This approach to the problem involved was recognized by this court in *Hay v. Long,* 78 Wash. 616, 139 Pac. 761 (1914), a case wherein an agent had leased his principal's property to the agent's wife. In that case we quoted with approval from the case of *Tyler v. Sanborn,* 128 Ill. 136, 21 N.E. 193 (1889), as follows, at 620:

"The doctrine is familiar, and has been often recognized by this court, that an agent cannot, either directly or indirectly, have an interest in the sale of the property of his principal which is within the scope of his agency, without the consent of his principal, freely given, after full knowledge of every matter known to an agent which might affect the principal; *Coat v. Coat,* 64 Ill. 74; *Ebelmesser v. Ebelmesser,* 99 Id. 548; *Zeigler v. Hughes,* 55 Id. 288; *Hughes v. Washington,* 72 Id. 85. It is of no consequence, in such case, that no fraud was actually intended, or that no advantage was in fact, derived from the transaction by the agent; Kerr on Fraud and Mistake (Bump's ed.), 173, 174; Perry on Trusts, sec. 206; Story's Eq., sec. 315; Bispham's Eq. (2d ed.), p. 299, sec. 238. The rule is not merely remedial of wrong actually committed,—it is intended to be preventive of wrong. Public policy requires, as was tersely and forcibly said by the Chief Justice in *Staats v. Bergen,* 2 C. E. Green. 554, that 'a trustee may not put himself in a position, in which, to be honest, must be a strain on him.' An agent may undoubtedly buy of his principal, or have an interest in the sale of property belonging to his principal; but in such case the burden is upon the agent to show that the principal had knowledge, not only of the fact that the agent was buying or interested, but also of every material fact known to the agent which might affect the principal, and that, having such knowledge, he freely consented to the

transaction:" *Tyler v. Sanborn,* 128 Ill. 136, 21 N. E. 193, 15 Am. St. 97, 4 L. R. A. 218.

That we have recently implemented this principle, although in a slightly different context, is evident from our holding in *Frisell v. Newman,* 71 Wn.2d 520, 429 P.2d 864 (1967), where, in speaking of a realtor's duty to fully inform his principal of the indirect acquisition by a subagent of an interest in the listed property, we stated, at 526:

> And, a failure on the part of such realtor to make the required disclosure and obtain the necessary consent amounts to a constructive fraud rendering the transaction voidable or the realtor otherwise liable at the instance of the principal, . . . . Thus, where it appears that such a realtor has, directly or indirectly, purchased or acquired an interest in his principal's property, the burden of coming forward with proof of good faith, full communication of all known facts, and the informed consent of his principal rests upon the realtor.

In the instant case, it was admitted that the respondent realty firm failed to disclose the close blood relationship existing between its saleslady and the prospective purchaser of appellant's property, despite the fact that a request for identity of the purchaser had been made. However inadvertently this failure occurred, it constituted a distinct breach of respondents' duty of full disclosure and an intrusion upon the obligation of undivided loyalty. This amounted to fraud in law. Regardless, therefore, of the materiality of the undisclosed circumstance to the appellants' decision to sell to the proffered purchaser at the price first offered, appellants are entitled to claim the remedy sought in this action, that is, the return of the commission paid by appellants to the respondents.

The judgment of the trial court is reversed and the cause remanded for entry of judgment granting the relief sought.

ROSELLINI, HUNTER, and HALE, JJ., and LAWLESS, J. Pro Tem., concur.

---

April 23, 1968. Petition for rehearing denied.