H. L. MILLER, Appellee,

v.

Pete J. BERKOSKI, Thelma L. Berkoski, Roger Berkoski, Earline Sue Berkoski and Loren Berkoski, Appellants,

v.

Larry MILLER, Appellee.

No. 64128.

Supreme Court of Iowa.

Oct. 15, 1980.

Rehearing Denied Nov. 6, 1980.

Bailey C. Webber of Webber, Gaumer & Emanuel, Ottumwa, for appellants.

D. W. Harris, Bloomfield, for appellees.

REYNOLDSON, Chief Justice.

This appeal requires us to determine whether the disclosure rules governing agency and fiduciary relationships apply in the real estate broker and seller situation. Trial court, rendering judgment for plaintiff H. L. (Harold) Miller in his law action for commission on the sale of defendants Berkoskis' farm, held Miller's hidden financial transactions with the buyer would not forfeit his right to the commission. We reverse on plaintiff's claim and affirm on defendants' counterclaim and cross–petition.

Plaintiff Harold Miller is an Iowa–licensed real estate broker in Baring, Missouri. At the time of these events his son, cross–petition defendant Larry Miller, worked for him as a salesman. Defendants Pete J. Berkoski and his wife Thelma owned a 560–acre Davis County farm on which the John Hancock Life Insurance Company held a mortgage. Other defendants Berkoski may have had interest in the farm but it is clear Pete J. Berkoski had authority to act for all the defendant owners.

In 1970 Pete, wanting to retire from farming, listed the 560 acres for sale with Harold Miller at a selling price of $196,000. The contract called for a five percent commission. Although the Millers showed the farm to several persons, no sale resulted and the exclusive listing expired. Pete would not extend the listing contract, but he told Millers in July or August of 1972 that he would pay the five percent commission if they sold the farm.

Millers ultimately obtained a $200,000 written offer from Robert Harsh, a Louisa County landowner. Pete rejected this offer after talking to his attorney, Carl McMurray. September 5, 1972, Millers brought to Berkoskis a second written offer from Harsh for a sale price of $210,000.

These offers provided for purchase price payments extending over a fifteen–year period. There is no dispute in the record that Harold Miller was knowledgeable in the income tax aspects of real estate transactions. He had put together a sophisticated tax–free exchange ten or twelve years before, involving Berkoskis' Indiana farm and the Davis County farm. When Pete and his wife considered selling, Harold Miller advised them extensively concerning the tax savings aspects of an installment contract. He formulated the terms of the initial listing agreement and the two subsequent offers to comply with tax law installment sale requirements.

The Millers told Pete that Harsh was a "good as gold" purchaser who owned 1200 acres of land and who had money for land investment. They did not tell Pete that Harsh had refused to give them a written property statement and that he had only $2500 in cash to pay down on a $210,000 real estate purchase. The offer called for a $7500 payment on November 1, 1972. Before presenting the second offer to Pete, Millers had arranged to loan this money to Harsh. They later took his promissory note in this amount, with interest at 7½ percent, secured by shares of Hynes & Howes stock that Harsh held. They did not tell Berkoskis about this transaction when presenting the second offer, and they isolated Harsh

from Berkoskis until after the contract had been drafted in attorney McMurray's office and it had been signed separately by the contracting parties.

On September 6, 1972, Harold Miller and Berkoskis went to McMurray's office where the contract was drawn on Iowa State Bar Association official form number 21 "Real Estate Contract–Installments." McMurray was Berkoskis' lawyer. There is no dispute that until this point Pete consistently wanted the tax advantages of an installment sale. A substantial part of this controversy centers around a prepayment clause that was inserted in the contract and ultimately aborted the installment sale tax advantage. The clause provided: "Buyers may make prepayments, at their discretion, without penalty."

While the contract was being prepared, Pete, his wife Thelma, and Harold Miller were present at all times. Larry Miller came down from the main floor bank (where he also worked) to the basement law office for part of the time. McMurray may have been absent for an interval. Harsh and his wife were never there. Larry testified his father "ramrodded" the contract preparation. Neither the Berkoskis nor McMurray recalled any conversation about the prepayment provision. Harold Miller and Larry Miller testified that Harold launched the question whether Berkoskis would accept all the money if Harsh wanted to prepay and that Pete replied "he would never object to taking a man's money."

On the crucial aspect of the potential tax consequences of inserting the prepayment clause, no one testified McMurray cautioned Berkoskis the provision might void their installment sale benefit, or that they sought or received any advice from him at that time. McMurray did not prepare Berkoskis' tax returns. Harold Miller, in response to a question as to what, if anything, he then told Berkoskis about the tax consequences, testified only that he "said to Pete what would happen." The other three persons in the room had no recollection of this claimed tax–related conversation.

Berkoskis wanted to include a contract provision reserving storage on the premises for the 1972 crop, but Harold Miller suggested this should be handled in a separate arrangement. A few days following execution of the contract Pete called Harsh to make arrangements for grain storage. Harsh said he would require full possession on March 1, 1973, in accordance with the contract. Pete claimed this caused him to sell his 1972 soybeans from the field in September at a reduced price. He complained to Larry Miller, who on December 11, 1972, obtained a written extension from Harsh for grain and hay storage until August 1, 1973.

Within a few days of the Berkoski transaction Millers had sold the adjoining Aylward and Gooden tracts to Harsh on contracts with small down payments, and Larry Miller was negotiating with a prospective tenant, suggesting an option to buy or at least a "first refusal" right. A later written listing that Millers prepared for Harsh's signature in February 1973 disclosed the latter had a $190,000 loan or loan commitment on the Berkoski tract. Harold Miller testified he told Harsh the land could be sold at a profit. By January 1973 the combined 800–acre farm was being advertised by an Illinois broker, who listed the farm in the name of Harold Miller.

The record is plain that Berkoskis, unsophisticated in real estate sales matters, were worried and insecure throughout the transaction. Berkoski testified he would not have signed the offer to buy if it had recited Millers were loaning Harsh $7500 of the down payment. In January 1973 Pete was so concerned about selling his livestock and machinery with so little paid down on the farm that Millers secretly loaned Harsh $10,000 more, accepting his promissory note secured by the Hynes & Howes stock. This was paid to Berkoskis to apply against the $30,000 March 1 possession date payment. Of course when Millers made this loan they were attempting to resell the farm for Harsh. Millers did not tell Berkoskis of this second loan or that Harsh had been turned down for an operating loan at the Davis County Savings Bank.

By at least July 1973 Millers had obtained for Harsh a profitable sale of the 800–acre tract. This sale required Berkoskis to be paid off, which the contract prepayment clause allowed. Berkoskis incurred a $2728 prepayment penalty on the John Hancock mortgage, and were required to pay additional 1973 income tax because the installment feature of their sale was lost.

Berkoskis initially refused to pay a commission to Millers because of their concern about Harsh's ability to perform the contract. Harold Miller sued for the commission on April 19, 1973. Defendants' answer, *inter alia*, alleged Millers violated their duty of candor and good faith and failed to make "full disclosure in respect to all sales prospects ... thereby causing these defendants to accept the contract proposal offered by Robert A. Harsh." A separate, extensive affirmative defense alleged Harsh was an accommodation buyer for Millers. Berkoskis also counterclaimed against Harold Miller and cross petitioned against Larry Miller for actual damages arising out of the prepayment provision and the additional income tax payment, for failing to advise them of their farm's true value, for loss on beans sold for lack of storage, and for punitive damages.

Trial court found Millers did not disclose to Berkoskis the two loans to Harsh, but did find that Harsh owned approximately 1000 acres around Morning Sun and had Hynes & Howes stock worth approximately $30,-000 at that time. Trial court found Berkoskis "relied on the broker to sell the farm but relied on their attorney for protection." The court further found Berkoskis paid additional income tax and the prepayment penalty. Nonetheless, the court considered its decision controlled by *Murphy v. Brown*, 252 Iowa 764, 108 N.W.2d 353 (1961), a decision we discuss below.

■ I. In this law action the fact–findings of trial court have the force of a jury verdict and will not be disturbed if supported by substantial evidence. Iowa R.App.P. 14(f)(1). However, this principle of law does not preclude our inquiry into

whether trial court applied erroneous rules of law that materially affected its decision. *See Linge v. Ralston Purina Co.*, 293 N.W.2d 191, 195 (Iowa 1980); *Knauss v. Kemin Industries, Inc.*, 267 N.W.2d 56, 57 (Iowa 1978); *Farmers Insurance Group v. Merryweather*, 214 N.W.2d 184, 186-87 (Iowa 1974).

A realtor's relationship with the seller is that of agent and principal. *See* 12 Am.Jur.2d *Brokers* § 83, at 835 (1964). The rules of agency apply here, including the duty of undivided loyalty and disclosure:

> Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information *which is relevant to affairs entrusted to him and which*, as the agent has notice, *the principal would desire to have* . . . .

Restatement (Second) of Agency § 381, at 182 (1958) (emphasis supplied). *See Swift v. White*, 256 Iowa 1013, 1015, 129 N.W.2d 748, 750 (1964) ("If we assume defendant was plaintiff's agent, his duty as a real estate broker can be no more than a full, fair and prompt disclosure of all facts within his knowledge which are or may be material."); *R. A. Poff & Co. v. Ottaway*, 191 Va. 779, 785, 62 S.E.2d 865, 868 (1951) ("Because of the confidential relationship between them it is the broker's duty . . . to give [the seller] fully and frankly such information as he . . . may have of the prospective purchaser's financial situation."); *Mersky v. Multiple Listing Bureau of Olympia, Inc.*, 73 Wash.2d 225, 229, 437 P.2d 897, 899 (1968) ("[T]here flows from this agency relationship . . . the legal, ethical, and moral responsibility on the part of the listing broker . . . to make, in all instances, a full, fair, and timely disclosure to the principal of all facts . . . which are, or may be, material in connection with the matter . . . which might affect the principal's rights and interests or influence his actions."); 12 Am.Jur.2d *Brokers* § 89, at 843 (1964) ("It is the broker's duty to give the principal such information as he may have of the prospective purchaser's financial situation.").

The American Law Institute's comment (a) under the above-quoted section 381 ("Duty to Give Information") pertinently states, "The duty exists if he [the agent] has notice of facts which, in view of his relations with the principal, he should know may affect the desires of his principal as to his own conduct or the conduct of the principal . . . ." Illustration 2 provides the following example:

> A, a real estate broker acting for P, introduces to P as the real purchaser one whom he knows to be acting for a person with whom P would be unwilling to deal. A commits a breach of duty by so doing and is not entitled to commission for conducting the transaction.

It should be noted this principle of law does not turn on damage to the seller, but on breach of the broker's duty to disclose information.

In the case before us, the record is clear that Berkoskis would have been interested in knowing that Harsh would not provide a written property statement, that he was "thin" on liquidity and had only $2500 to pay down on a $210,000 purchase, and that Millers were going to loan him $7500 at interest for an early payment on the farm. Because their sale price understanding with Millers was indefinite, Berkoskis would have, and could have, refused to sign the contract had they known as much about Harsh's lack of financial liquidity as Millers did. This point is underscored by Millers' maneuvers to keep that knowledge from them. If Pete had known Harsh was that short of cash, he might have concluded Harsh could not have operated the farm and consequently would resell. This in turn would have caused Pete to examine critically Harold Miller's suggestion the prepayment provision be added to the contract.

Although trial court found Berkoskis "relied on their attorney for protection," there is no indication in the record they relied on him for protection from nondisclosure by their own agent, and it would be a strange rule that would require a lawyer for that service. It is true, of course, that Berkoskis' ultimate damage arrived through events they did not anticipate. Nonetheless, that damage, in the form of income taxes and

mortgage prepayment penalties, would have been avoided but for the contract Harold Miller "ramrodded." The fact that Berkoskis were paid off because Millers promptly secured a new, higher--price listing from Harsh and resold the land for him at a profit should have no weight in an analysis of Millers' prior duties to their principals, the Berkoskis.

■ An agency relationship is confidential and fiduciary in character, *Darling v. Nineteen–Eighty Corp.*, 176 N.W.2d 765, 768 (Iowa 1970), requiring a high degree of honesty. *Miller v. Iowa Real Estate Commission*, 274 N.W.2d 288, 292 (Iowa 1979).

In this appeal Millers do not contest the above legal concepts and principles. Rather, they argue (as trial court found) this situation is controlled by *Murphy v. Brown*, 252 Iowa 764, 108 N.W.2d 353. But in *Murphy* the duty to disclose was not an issue:

> The only errors assigned were that the court erred in ruling as a matter of law (1) that the plaintiff had procured a buyer who was ready, willing and able to go through with the contract as set forth in the listing contract and in the offer to buy, and (2) that plaintiff had earned his commission immediately on submission of the offer to defendant.

*Id.* at 766, 108 N.W.2d at 354. The seller merely claimed the buyer was not "able" because the broker provided $1000 of the $6000 down payment. *Id.* at 768, 108 N.W.2d at 355. The seller conceded the buyer's financial responsibility. *Id.*, 108 N.W.2d at 355. The *Murphy* court noted carefully there was no detriment to the seller and no gain to the agent, and limited its holding to the circumstances disclosed by that record. *Id.* at 769–71, 108 N.W.2d at 356–57. That decision has no direct application to the situation before us and is not controlling.

Section 391, Restatement (Second) of Agency, entitled, "Acting for Adverse Party without Principal's Consent," provides: "Unless otherwise agreed, an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge." So structured, it is wholly consistent with section 381, "Duty to Give Information," quoted above. But the *Murphy* court misapplied, as an exception to both sections, comment (b) under section 391:

> An agent can properly deal with the other party to a transaction *if such dealing is not inconsistent with his duties to the principal.* Thus, an agent employed to sell can properly lend money to the buyer to complete the purchase or he may "split" his commission with the buyer, unless because of business policy or otherwise it is understood that he is not to do so.

(Emphasis supplied.) This comment does not state the agent is not obligated to inform his principal of such transactions with the adverse party. In fact, it limits the agent's dealings with the other party to those "not inconsistent with his duties to the principal." One of those duties is the section 381 obligation to provide his principal with relevant information "the principal would desire to have." The sunshine requirements of the latter section therefore must be read into comment (b).

Follow up comment (c), section 391, further illuminates the basic requirement of disclosure:

> Not only must an agent not act in the interests of other parties *without the consent of all concerned*, but he must not enter into transactions with agents of other principals, *the effect of which may give the agent a self–interest in improperly advising his principal.*

(Emphasis supplied.) The first provision of comment (c) reinforces the disclosure requirement. The second provision, prohibiting transactions with *agents* of other principals that might influence the agent to improperly advise his principal, clearly prohibits such transactions with the other *principals.*

■ In the case before us the brokers' loan transaction (for profit) with the buyer, and their potential resale (for another com-

mission), may have influenced them to improperly advise the seller by suggesting the prepayment provision. Millers' secret transactions with Harsh violated sections 381, 391, and comment (c) of section 391, Restatement (Second) of Agency.

A rule of law that a broker has no duty to disclose to the seller his arrangement with a prospective purchaser to furnish most of the proposed down payment for the property would generate an inconsistency between comment (b) and sections 381 and 391 that is neither required by, nor in conformity with, prevailing rules of construction. Unless these provisions are in direct conflict they should be considered together and harmonized if possible. *See Southeast Warren Community School District v. Department of Public Instruction*, 285 N.W.2d 173, 178 (Iowa 1979). Such harmony is easily achieved by requiring that the broker (1) *apprise* the seller of comment (b) transactions with the buyer when these dealings would provide relevant information "the principal would desire to have" (section 381), and (2) *avoid* secret transactions with the buyer that might give the broker a self–interest in improperly advising his seller, as section 391 and comment (c) under that section suggest.

II. Just as we have dislodged the encrusted concepts of the ancient doctrine of caveat emptor in the years since *Murphy*, this court has rejected the old predatory philosophies of business relationships. Our decisions have enhanced the obligations of agents and fiduciaries, functioning in positions of trust and confidence, to perform their duties in complete candor, honesty, loyalty and good faith. *See, e. g., Linge*, 293 N.W.2d at 193–94 (fiduciary duty of officers, directors, and majority stockholders); *In re Estate of Herm*, 284 N.W.2d 191, 200 (Iowa 1979) (relatives in confidential relationship); *Rowen v. LeMars Mutual Insurance Co.*, 282 N.W.2d 639, 649, 654 (Iowa 1979) (fiduciary duties of corporate managers and attorney); *Miller*, 274 N.W.2d at 292 ("Real estate brokers and salesmen represent their clients in the capacity of agent. This is a fiduciary relationship which re-

quires a high degree of honesty and trust between the parties."); *Holi–Rest, Inc. v. Treloar*, 217 N.W.2d 517, 525 (Iowa 1974) (duty of corporate officers and directors to corporation and minority stockholders); *Holden v. Construction Machinery Co.*, 202 N.W.2d 348, 358 (Iowa 1972) (duty of officers and directors to corporation and shareholders); *First National Bank in Lenox v. Brown*, 181 N.W.2d 178, 182 (Iowa 1970) (bank's duty to disclose encumbrance on property borrower was buying); *Smith v. Peterson*, 282 N.W.2d 761, 767 (Iowa App. 1979) (duty of realtor with superior knowledge to disclose those material facts that may be favorable to him and unfavorable to the other party).

This case does not present a situation justifying a retreat from these modern decisions that lift the ethics of honest agents and fiduciaries to the benchmark of legal obligations.

To condone the Millers' failure to divulge their secret transactions with Harsh would blunt those standards of honesty, forthrightness and fair dealing promulgated by the profession itself. Thus in the Iowa Real Estate Commission's manual under "Duties" is the warning that "[t]he broker can also be held accountable for misconduct, such as secretly buying property from the principal or not disclosing material facts to the principal . . . he must deal fairly and honestly with both his client and customer/buyer at all times." Iowa Real Estate Commission, *Real Estate Manual* 70–71 (1980).

In addition to the duties imposed by the listing contract, the agent is subject to the following legal duties:

1. To be loyal, faithful and promote the best interests of his principal;

    .        .        .        .        .

4. To account to and notify the principal of all transactions, or material facts, involving the agency or the principal's property;

    .        .        .        .        .

6. Not to represent both contracting parties at the same time, unless each

has been informed and each has consented to the agent's acting for the other party;

7. Not to engage in any transaction conflicting with the interests of his principal, without the consent of his principal;

8. Not to profit from the agency over and above the agreed commission

. . . .

*Id.* at 72.

The antiquated legal analysis that approached the relationship of brokers and sellers as one between arms–length adversaries cuts against the grain of our recent decisions. *Murphy* is overruled to the extent it is inconsistent with the legal principles applied in this decision.

III. Opinions from other jurisdictions support the decision we reach in this appeal. Although factual settings may differ, the logic and reason of these authorities are persuasive:

The appellant brokers, by secretly pledging both the sizeable commission due on the sale and a large amount of personal funds to the purchasers in an apparent effort to ensure the consummation of the sale and their eventual remuneration, inextricably entwined their interests with those of the purchasers. The brokers thus placed themselves in a position where, at the very least, they were vulnerable to a temptation to betray the sellers whose interests they had been hired to protect, and are, we conclude, as a matter of law, precluded from recovering any compensation

.    .    .    .    .

The appellant brokers protest, however, that the sellers, who were to receive a purchase price in excess of the listed selling price from the sale, have failed to demonstrate any injury occasioned by the brokers' breach of their fiduciary duties, and that, in the absence of such a showing, the sellers may not assert such a breach as a defense to the brokers' claims for the real estate commission. We disagree. Based upon considerations of pub-

lic policy, the rule precluding the recovery of a commission by a broker who has violated his duty of loyalty to his employer was intended not solely to remedy actual wrongs caused by such misconduct, but to discourage the occurrence of such misconduct altogether. Thus this court has declared that "the rule does not depend upon whether or not the principal is injured by the conduct of the agent. The wholesome rule is that the agent shall not put himself in a position where he may be tempted to betray his principal, or to serve himself at the expense of his principal." *Pagel v. Creasy, supra,* 6 Ohio App. [199] at 206, 363 N.E.2d at 780–81, (Citations.)

*Greenberg v. Meyer,* 50 Ohio App.2d 381, 383–84, 363 N.E.2d 779, 780–81 (1977). *See Crosby v. Ashley,* 291 So.2d 12, 14 (Fla.App. 1974) ("[A] finding of nondisclosure by the broker of a fact material to the sale would be sufficient to bar recovery of the commission without regard to whether loss to the seller resulted therefrom."); *Case v. Business Centers, Inc.,* 48 Ohio App.2d 267, 270, 357 N.E.2d 47, 49 (1976) ("[A] broker is a fiduciary who owes his principal the duties of disclosure, good faith and loyalty as to all matters within the scope of his employment. . . . [C]oncealment of facts, or other breach of trust . . . will preclude recovery of a fee by a broker for services rendered to that principal."); *Mersky,* 73 Wash.2d at 231, 437 P.2d at 900 ("It is of no consequence . . . that the broker may be able to show that the breach of his duty of full disclosure and undivided loyalty did not involve intentional or deliberate fraud, or did not result in injury to the principal, or did not materially affect the principal's ultimate decision in the transaction."); 3 Am. Jur.2d *Agency* § 200, at 581–82 (1962) ("The duty of an agent to make full disclosure to his principal of all material facts relevant to the agency is fundamental to the fiduciary relation of principal and agent. . . . If it appears that an agent has been guilty of any concealment . . . the transactions will not be allowed to stand."); 12 Am.Jur.2d *Brokers* § 89, at 842 (1964) ("A neglect [to make full disclosure of all facts which

might affect his principal's rights and interests or influence his action in relation to the subject matter of the employment] precludes *recovery of commissions for his services.").*

█ Pursuant to the above legal rationale, and in light of Millers' admitted concealment, we hold as a matter of law and as a matter of public policy "to keep the agent's eye single and clear to the rights and welfare of his principal," *Meek v. Hurst,* 223 Mo. 688, 698, 122 S.W. 1022, 1024 (1909), that Millers are not entitled to a commission, and reverse for entry of judgment for Berkoskis on plaintiff's petition. We hold there is substantial evidence to support trial court's findings on the counterclaim and cross–petition. No erroneous application of law as to those claims is apparent. We therefore affirm trial court's ruling on the counterclaim and cross ·petition. We remand for judgment in conformance with this opinion.

REVERSED ON PLAINTIFF'S CLAIM; AFFIRMED ON DEFENDANTS' COUNTERCLAIM AND CROSS–PETITION, AND REMANDED WITH DIRECTIONS.

All Justices concur except McCORMICK, J., who concurs specially, UHLENHOPP, LeGRAND and ALLBEE, JJ., who dissent, and McGIVERIN and SCHULTZ, JJ., who take no part.

McCORMICK, Justice (concurring specially).

I believe the trial court findings of fact are supported by substantial evidence, and we are bound by them. To the extent the majority opinion makes contrary findings as a matter of law, I am unable to join it. However, the controlling question is a legal one. It is whether Millers forfeited their commission because of their failure to disclose to Berkoskis their loans to Harsh. On that question I agree with the court that they had a duty to disclose the loans and that they forfeited their commission by keeping the loans secret. As the court holds in division III of the opinion, this result follows without regard to whether the breach of duty caused Berkoskis any loss.

UHLENHOPP, Justice (dissenting).

I differ with the court in two respects involving the facts and the law.

*Facts.* This case was tried by ordinary proceedings. Hence two rules govern our review. One is that the trial court's fact findings are conclusive if they are supported by substantial evidence. Iowa R.App.P. 14(*f*)(1). The other is that we view the evidence in the light most favorable to the judgment. *Long v. Glidden Mutual Insurance Association,* 215 N.W.2d 271, 272 (Iowa 1974).

Miller's efforts were undoubtedly the producing cause of the sale of the Berkoskis' farm to Harsh.˙ The controlling issue is whether Miller acted in bad faith in this sale. For example, the Berkoskis have argued throughout the litigation that Miller and Harsh were in this enterprise together from the start to develop two commissions for Miller and a profit for Harsh. Miller has argued to the contrary; he does admit that he temporarily lent Harsh money on collateral to apply on the down payment. The trial court did not find the facts in accordance with the Berkoskis' argument, and did not find bad faith by Miller. If the facts on the controlling issue of bona fides as found by this court are placed beside the facts as found by the trial court, we have two entirely different cases. Both cases have substantial evidentiary support in circumstances and direct testimony.

Had the trial court found the facts as this court finds them, I too would hold for the Berkoskis. But the trial court on substantial evidence did not so find the facts and did not find bad faith. Hence the trial court gave judgment for Miller, applying the rule in *Murphy v. Brown,* 252 Iowa 764, 770, 108 N.W.2d 353, 356 (1961). In *Murphy* the realtor, without knowledge by the vendor, advanced $1000 to the prospective purchasers out of his commission to apply toward earnest money of $1500. There as here the trial court did not find bad faith. In allowing the realtor to have his commission, this court stated:

It is true that unless otherwise agreed, an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge. Was this such an act on behalf of an adverse party? . . .

It is hard to see where the plaintiff's acts herein were inconsistent with his duties to the principal. He was to find a financially responsible buyer, able to pay down $6000 and assume the balance of the obligation. The trial court found as a matter of fact that this type of business is known to favor a very practical approach to its problems, that furnishing a part of the down payment from the broker's commission "did not under the law or the ethics of the real estate profession disclose such bad faith or gross misconduct on their part as to warrant forfeiture of their right to commission." We agree, and conclude there is nothing in the record to justify a finding of bad faith or gross misconduct as a matter of law. Neither the business policy nor the understanding of the parties prohibited that act by the plaintiff. Actually it may be said that by this sacrifice of a part of his commission he was furthering his principal's interest in obtaining a sale for him under the exact terms he desired. . . . If, then, we assume the principal desired to sell on the terms listed, these terms were met without prejudice to the principal and without gain to the agent. Although it is true this advancement or gift of commission to the buyer was not disclosed to the seller, it is hard to see how he thereby suffered any detriment, and there is not the slightest inference of fraud or deceit in this record to justify a denial of plaintiff's right to his commission. The conclusion must be that $1000 of the agreed commission could be included in the amount of the down payment of the buyer under these circumstances.

This is not the situation where the agent is shown to act in his own interest, or to obtain compensation from both parties, or to do acts detrimental to his principal, or where he attempts to bind his principal to an unauthorized agreement. *Id.* at 770 71, 108 N.W.2d at 356–57 (citations omitted). *See also* Restatement (Second) of Agency § 391, Comment *b* (1958):

An agent can properly deal with the other party to a transaction if such dealing is not inconsistent with his duties to the principal. Thus, an agent employed to sell can properly lend money to the buyer to complete the purchase or he may "split" his commission with the buyer, unless because of business policy or otherwise it is understood that he is not to do so.

This court has actually reviewed the present case de novo, and it has viewed the evidence in the light most unfavorable to the judgment. The rules directing us to proceed in a contrary manner are sound ones. The trial court saw and heard Miller in person as well as Berkoski and the other witnesses, and was in a better position than we are to ascertain the truth.

I would thus adhere to the facts as found by the trial court.

*Law.* I agree with this court's quotations from the authorities about an agent's duties, and I agree with the decisions which disallow a realtor his commission if he acts in bad faith toward his principal. I disagree, however, with the court's overruling *Murphy.* I do not understand *Murphy* to apply where an agent acts in bad faith. But where a realtor acts in good faith, as under the trial court's findings on substantial evidence, then I agree with the *Murphy* rule that the realtor does not, by lending money to the purchaser, forfeit his commission.

Law should be realistic. A couple looking for a home go to a realtor. They can arrange long-term financing but do not have the down payment. The realtor in good faith arranges the down payment for them from an institution he deals with, or from his own funds, or even out of his commission, and sells them one of the homes he has listed. I see no objection to

this when the realtor acts in good faith. In *Murphy* the court unanimously approved the statement that "this type of business is known to favor a very practical approach to its problems." 252 Iowa at 770, 108 N.W.2d at 356.

Like a jury, the trial court could accept the testimony it found credible and reject the testimony it found incredible, and it could draw the inferences it found reasonable from the circumstances and refuse to draw those it found unreasonable. The weight and value of the evidence was for the trial court. I would follow the trial court's findings, apply *Murphy* as the trial court did, and affirm the judgment.

LeGRAND and ALLBEE, JJ., join in this dissent.